The WINTER GARDEN COMPANY, Inc.,
the Winter Garden Freezer Company, Inc., Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Civ. A. No. 4413.

United States District Court
E. D. Tennessee, N. D.

Oct. 22, 1962.

As Amended Dec. 19, 1962.

---

**282**

Frantz, McConnell & Seymour, Knoxville, Tenn., Herbert Glazer, Memphis, Tenn., Wm. J. Augello, Jr., New York City, for plaintiffs.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., John H. D. Wigger, Department of Justice, Washington, D. C., Robert Ginnane, General Counsel, and Fritz R. Kahn, Asst. General Counsel, Interstate Commerce Commission, Washington, D. C., Lee Loevinger, Asst. Atty. Gen., Washington, D. C., for defendants.

Before SHACKELFORD MILLER, Jr., Circuit Judge, DARR, Senior District Judge, and ROBERT L. TAYLOR, District Judge.

This is a combined action by The Winter Garden Company (hereinafter referred to as Garden) and by The Winter Garden Freezer Company (hereinafter referred to as Freezer) against the United States of America and the Interstate Commerce Commission (hereinafter called the Commission) to annul and set aside among other things the Commission's Orders of June 30, 1961 and December 26, 1961 relating to the "Grandfather" Application of Garden (No. MC-118025, referred to herein as 025) and to the "Grandfather Application of Freezer (No. MC-118244, referred to herein as 244). The prayer asked further for "a decree declaring that Plaintiffs were in bona fide operation on May 1, 1958 and continuous (sic) since that time with- in the territory described in their GRANDFATHER APPLICATIONS and that the entire proceeding be remanded to the DEFENDANT COMMISSION for further consideration and new findings not inconsistent with the Court's decree * * *." Jurisdiction is derived from sections of the Interstate Commerce Act found in 49 U.S.C. §§ 17(9), 305(g) and 305(h); of the Administrative Procedure Act found in 5 U.S.C. § 1009 and in 28 U.S.C. §§ 1336, 1398, 2284 and 2325.

Both plaintiffs were packers and distributors of frozen foods, some of which were transported by plaintiffs in their own or leased motor vehicles. Although Garden owned some of the stock of Freezer, the plaintiffs were otherwise unrelated. Garden's main plant and office was in Knoxville, Tennessee; Freezer's main plant and office, at Bells, Tennessee. The managements were distinct and unrelated.

In the course of time, each plaintiff organized a separate division for the transportation by motor vehicle of its products, some of which it owned at the time of shipment, and title to some of which, by contract with the purchasers, had passed to the latter before shipment. In order to make up full loads, it was the practice of each to combine in one shipment products which it owned and products, title to which was in others. In the course of time, each plaintiff developed some business as common carriers for others especially on the return trips.

Until 1958, frozen fruits, berries and vegetables, which were principal products of each plaintiff, had been construed by the Courts to be agricultural or horticultural products, and motor vehicles by which they were shipped in interstate commerce had been held by the courts to be exempt from regulation by the Commission. By Section 7 of the Transportation Act of 1958 (49 U.S.C. § 303(b) (6), the provision applying to motor vehicles carrying agricultural and horticultural products was amended to exclude "frozen fruits, frozen berries, frozen vegetables * * *." However, by Section 7

(c) [1] of the Act (49 U.S.C. following section 303), it was provided, in substance that if any person were in bona fide operation on May 1, 1958 and since that time, "within any territory," except for interruptions of service over which it had no control, the Commission shall issue a certificate or permit of the type warranted by the operation provided application were made within a stated time.

Application for the "grandfather" rights so provided was timely made by Garden in 025 and by Freezer in 244. The application for Garden was heard before an Examiner in Knoxville, Tennessee and that for Freezer before a different Examiner in Memphis, Tennessee. The Examiners made their findings, and exceptions were filed in each case by applicant, and by Gordon Transports, Inc. in 244. Protestant railroads and truck lines filed replies to applicant's exceptions in 025.

Exceptions in the two cases were heard by Division 1 of the Commission and disposed of in one report dated June 30, 1961. The Commission adopted the material facts found by the Examiners, but granted substantially lesser authority than was recommended by them.

In 025, applicant was granted authority to haul by motor vehicle over irregular routes:

"(1) frozen vegetables (a) from Knoxville, Tenn., to Birmingham, Ala., Houston, Del., Miami and Jacksonville, Fla., Chicago, Ill., Louisville, Ky., Watertown, Mass., and St. Louis, Mo.; and (b) from Chattanooga, Tenn., to Watertown, Mass.; and

"(2) frozen vegetables and frozen berries (a) from Knoxville, Tenn., to Atlanta, Ga., Landover, Md., Omaha, Nebr., Jersey City, N. J., Rochester, N. Y., and points in the New York, N. Y., commercial zone, as defined by the Commission, Oklahoma City, Okla., Philadelphia and Scranton, Pa., Houston, Tex., Richmond, Va., Milwaukee, Wis., and points in Michigan, North Carolina, and Ohio; and (b) from Chattanooga, Tenn., to Oklahoma City, Okla."

The authority was granted, subject to the following conditions:

"(1) that applicant shall conduct its for-hire transportation operations separate from its other business activities, (2) that applicant shall maintain separate accounts and records for its private and for-hire carrier operations, and (3) that applicant shall not at the same time and in the same vehicle transport property both as a for-hire and private carrier; and that the application in all other respects should be denied."

In 244, applicant was granted authority to haul by motor vehicle over irregular routes:

"Frozen fruits, frozen berries and frozen vegetables (1) from points in Tennessee to the District of Columbia, Little Rock and Searcy, Ark., Hartford, Conn., Houston, Del., Evansville and Indianapolis, Ind., Kansas City and Wichita, Kans., Louisville, Ky., Baltimore and Landover, Md., Boston and Worcester, Mass., Hopkins, Minn., St. Louis, Mo., Omaha, Nebr., Ardmore and Oklahoma City, Okla., Exmore, Va., and Milwaukee, Wis., and to points in Alabama, Florida,

1. Pertinent portions of Sec. 7(c) follow:
"(c) Subject to the provisions of section 210 of the Interstate Commerce Act, if any person (or its predecessor in interest) was in bona fide operation on May 1, 1958, over any route or routes or within any territory, in the transportation of property for compensation by motor vehicle made subject to the provisions of part II of that Act by paragraph (a) of this section, in interstate or foreign commerce, and has so operated since that time * * * except * * * as to interruptions of service over which such applicant * * * had no control, the Interstate Commerce Commission shall without further proceedings issue a certificate or permit, as the type of operation may warrant, authorizing such operations as a common or contract carrier by motor vehicle. if application is made to the said Commission as provided in part II of the Interstate Commerce Act and within one hundred and twenty days after the date on which this section takes effect. * * *"

Georgia, Illinois, Louisiana, Michigan, Mississippi, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, and Texas; (2) from Salisbury, Md., to Knoxville, Tenn.; (3) from Saginaw, Mich., to Knoxville and Nashville, Tenn.; (4) from Exmore, Va., to Charlotte, N. C., and Tampa, Fla.; (5) from Dallas, Tex., to Memphis, Tenn.; (6) from McAllen, Tex., to Little Rock, Ark.; and (7) from Modesto, Calif., to Knoxville and Nashville, Tenn., Birmingham, Ala., and Louisville, Ky."

The authority was granted, subject to the following conditions:

"(1) that applicant shall conduct its for-hire transportation operations separate from its other business activities, (2) that applicant shall maintain separate accounts and records for its private and for-hire operations, and (3) that applicant shall not at the same time and in the same vehicle transport property both as a for-hire and private carrier; and that the application in all other respects should be denied."

Commissioner Webb dissented in part, stating that the report of the majority of the Commissioners construed too rigidly the "grandfather" provisions of section 7(c) of the Transportation Act of 1958. He observed that although applicants did not serve certain origins and destinations "both before and after May 1, 1952, a greater territorial grant should have been made in order to give the applicants substantial parity of operations both before and after the 'grandfather' date." He was of the opinion that authority should have been "granted in No. MC-118025 from all points in Tennessee", and in 244 he would have included "within the territorial grant authority from Tennessee to Maryland and Virginia points, and also from Texas points to points in Tennessee."

The changes granted by the Commission, as compared with the authority listed by the Examiners, are set forth in Footnote 2.[2]

Plaintiffs contend that the ultimate findings and conclusions of the Commission are not based upon lawful and proper statutory standards and exceed statutory powers and are, therefore, erroneous. They ask that such findings and conclusions be set aside and the proceedings remanded to the Commission for further consideration in accordance with proper statutory standards.

2. In 025, Division 1 denied
  (1) Frozen berries from Knoxville, Tenn. to Louisville, Ky.;
  (2) Frozen vegetables and berries from Knoxville, Tenn. to
    (a) Asbury Park, N. J.;
    (b) All points in New York State, except Rochester and New York, New York Commercial Zone;
    (c) Lubbock, Tex.,
    (d) Norfolk, Va.
  (3) Frozen vegetables and berries from Bells, Tenn. to Lubbock and Houston, Tex.
Division 1 broadened the recommended grant for frozen vegetables from Knoxville, Tenn. to Grand Rapids, Detroit and Muskegon, Mich., to points in Michigan and broadened the grant to Raleigh, Charlotte and Biltmore, North Carolina to points in North Carolina.
In 244, Division 1
  (1) Restricted the grant of authority for frozen fruits, berries and vegetables from all points in Tennessee to
    (a) All points in Conn. by limiting the authority to Hartford;
    (b) All points in Indiana by limiting authority to Evansville and Indianapolis;
    (c) All points in Mass. by limiting authority to Boston and Worcester;
    (d) All points in Minnesota by limiting authority to Hopkins.
  (2) Denied authority from Tenn. to Kansas City, Mo. and Ardmore, Okla.;
  (3) Restricted the authority from Salisbury, Md. to Tenn. by limiting it to Knoxville;
  (4) Restricted the authority from Saginaw, Mich. to Tenn. by limiting it to Knoxville and Nashville;
  (5) Restricted the authority from Exmore, Va. to North Carolina and Louisiana by limiting it to Charlotte, N. C. and Tampa, Fla., and
  (6) Restricted the authority from Texas to Little Rock, Ark., Tennessee and Louisiana by limiting the authority
    (a) From Dallas to Memphis, and
    (b) From McAllen to Little Rock.

Plaintiffs further contend that the Commission's determination of applicants' scope of bona fide operations before and after May 1, 1958 was based upon an improper and incomplete application of the pertinent statutory standards and is not supported by adequate and basic findings and is unsupported by substantial evidence; that the Commission exceeded its statutory powers by requiring the separation of plaintiffs' private and for-hire statutory operations; and, that the Commission was arbitrary and capricious in the exercise of its administrative discretion.

■ Jurisdiction of a three-judge statutory District Court to review orders of the Commission is limited to the determination, whether the orders are within the statutory authority of the Commission, are based upon adequate findings, and in turn are supported by substantial evidence. Rochester Telephone Corp. v. United States, 307 U.S. 125, 140, 146, 59 S.Ct. 754, 83 L.Ed. 1147; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260.

■ Congress has entrusted to the Commission "delineation of the area" which the carrier may serve. United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 480, 62 S.Ct. 722, 86 L.Ed. 971.

In the Carolina Freight Carriers case, the Court pointed out at pages 488 and 489, at page 729 of 62 S.Ct., that the grounds for the Commission's determination, namely, that only certain commodities could be carried and only a few between destinated points, were not clear, and that it was impossible to determine from the report whether proper standards were used and applied to the facts in the record; that the defect in the decision was not merely one of absence of a suitably complete statement of the reasons for the decision, but also a lack of basic or essential findings of fact to support the decision. Minneapolis & St. Louis Ry. Co. v. United States, 361 U. S. 173, 192–194, 80 S.Ct. 229, 4 L.Ed.

2d 223 (1959); Alabama Great Southern Ry. Co. v. United States, 340 U.S. 216, 227–228, 71 S.Ct. 264, 95 L.Ed. 225 (1951); United States v. Pierce Auto Freight Lines, 327 U.S. 515, 531–532, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

■ The Commission's discretion must be exercised in conformity with the policies of Congress and the courts should evaluate the evidence to determine if the ruling of the Commission accords with public interest. Schaffer Transp. Co. v. United States, 355 U.S. 83, 88, 78 S.Ct. 173, 2 L.Ed.2d 117.

■ In the field of transportation, the Commission possesses expert knowledge and its judgment is entitled to great deference because of its familiarity with the conditions in the motor transportation industry. American Trucking Ass'ns v. United States, 344 U.S. 298, 310, 73 S. Ct. 307, 97 L.Ed. 337; East Texas Motor Freight Lines v. Frozen Food Express, 351 U.S. 49, 54, 76 S.Ct. 574, 100 L.Ed. 917. But there are limits upon its statutory powers as fixed by the Congress and the duty of the courts on judicial review is to determine those limits. East Texas Motor Freight Lines v. Frozen Food Express, supra, p. 54, 76 S.Ct. p. 577.

■ "Characteristics" of the transportation service involved, and the geographical area serviced, are relevant to the territorial scope of the operations that may be granted under the "grandfather" clause. Alton R. R. Co. v. United States, 315 U.S. 15, 21, 62 S.Ct. 432, 436, 86 L.Ed. 586. "While the test of 'bona fide operation' within a specified 'territory' includes 'actual rather than potential or simulated service' (McDonald v. Thompson, 305 U.S. 263, 266 [59 S.Ct. 176, 83 L.Ed. 164]), it does not necessarily restrict operations to the precise points or areas already served." Irregular or sporadic trips may be due to the characteristics of the service. Characteristics of the service may have restricted the operation to a few points in a wide area which the carrier held itself out to serve. Characteristics of service

have been taken into consideration in determining the scope of the territory covered by certificates under the "grandfather clause". Operations on irregular routes within a wide territory have been authorized in case of common carriers of household goods. Bruce Transfer & Storage Co., 2 M.C.C. 150; William J. Wruck, 12 M.C.C. 150. Broad authority has been granted common carriers of oil field equipment and supplies. Charles B. Greer, Jr., 3 M.C.C. 483; Union City Transfer, 7 M.C.C. 717; L. C. Jones Trucking Co., 9 M.C.C. 740. A like result has been reached in case of automobile transporters. Alton R. R. Co. v. United States, 315 U.S. 15, 20, 62 S.Ct. 432, 86 L.Ed. 586.

### No. MC–118025

In 025, the Commission observed that plaintiff's operations were divided into two categories "(1) those from several points in Tennessee to points in other States, and (2) those from points in States other than Tennessee to points in several States, including Tennessee. Outbound operations performed by it from points in Tennessee have been predominantly from Knoxville, with a few scattered shipments having been handled from other origins. In view thereof, we do not believe applicant's past operations from points in Tennessee are sufficiently broad in scope so as to entitle it to statewide authority and our grant on this outbound traffic will be limited to specific origins * * *."

Plaintiffs' services are confined to points at which cold storage service facilities are located and these locations sometimes change from season to season.

The traffic available to plaintiffs is limited to frozen fruits, berries and vegetables.[3] These items are perishable, seasonal and are greatly dependent upon weather, crop and market conditions. Services rendered by the plaintiffs were primarily in less than truck load quantities, requiring multiple pick-ups and multiple deliveries, averaging, in the case of Garden, two or three, but occasionally

running to seven stops, and at locations which changed from time to time.

The originating points for the frozen fruit, berry and vegetable traffic constantly change, depending upon the availability of cold-storage freezer space and varying crop conditions. Garden's operations have consisted of multiple pickups from various plants and storage points in Tennessee, such as Knoxville, Oak Ridge, Dayton and Chattanooga in East Tennessee, Nashville in Middle Tennessee, and Jackson, Bells and Memphis in West Tennessee.

Garden's authority was limited by the Commission, however, to Knoxville and Chattanooga as originating points. It has held itself out to serve all origins in Tennessee and its operations have followed the necessary storage point changes dictated by the shippers' requirements. Abstracts of shipments presented by Winter Garden Company, Inc. listed Knoxville as the origin for most of its movements, but this was actually the starting point of the truck. The additional points at which the truck was stopped for completion of loading were not listed. The record is clear, however, that this plaintiff continued multiple pick-up service at eight widely-scattered origins throughout Tennessee, and its shipping documents presented during the course of the hearing confirmed the applicant's testimony to this effect.

We think the proof shows that the characteristics of this applicant's operations during the critical period from points in Tennessee were such as to entitle it to statewide authority for outbound traffic and that the Commission in holding to the contrary acted arbitrarily and without supporting evidence.

The report and order of the Commission indicate that the sole test employed by it for destination points was predominance of movement without regard to the changing characteristics of this traffic. The record shows that the destination points of frozen fruit, berry and vegetable traffic constantly change with the

---

3. Garden dropped its application with respect to fruits after filing its application.

availability of freezer space, crop conditions, and changes in prices, marketing practices and consumer demand.

Storage facilities are often filled. Customers change their storage facilities and the destination points served by applicant have changed during the critical period. In 025, shipments to Bridgeport, Connecticut prior to May 1, 1958 were delivered to Hartford, Connecticut after that date; earlier traffic to Dover, Delaware was switched to Houston, Delaware in April, 1958; and shipments to Washington, D. C. went to Landover, Maryland after March 31, 1958.

The Commission further found that Garden made no showing that it handled shipments from points in Tennessee to points in California, Kansas, Mississippi, Tennessee or West Virginia during the critical period and denied its application for operation to handle shipments from points in Tennessee to these States; that plaintiff provided service from Tennessee origins to points in Arkansas only before the critical date and to points in South Carolina only after that date, and denied the application for operation from origin to the destination States; and that destinations in Connecticut, Indiana, Louisiana, Minnesota, Rhode Island and Maryland, except with respect to Landover, Maryland, were served from certain Tennessee origins in 1956 and again after the critical date and concluded the operations failed to meet the statutory standards and denied the application, except with respect to Landover. The Commission further held that the operations during the critical period from Knoxville to numerous points in Michigan, North Carolina and Ohio demonstrated a pattern of substantial and continuous operation in Michigan, North Carolina and Ohio and granted statewide authority in those States. The Commission further held:

"  *   *   * In addition, considerable point-to-point authority from Knoxville and to a lesser extent from Chattanooga to specific points in the considered destination States appear warranted and will be granted.

However, unlike shipments to Ohio points, for example, a breakdown of these shipments, as reflected in the appendixes, reveal that applicant provided service only to widely scattered points in these States, and we conclude that such showing does not establish the necessary consistency and continuity of operation from and to representative points in each State claimed as would warrant a grant of other than point-to-point authority. Applicant's willingness and desire to provide service from points throughout the considered area is not controlling in the absence of actual consistent and reasonably frequent movements. All things considered, we believe the grant of authority hereinafter described in our findings accurately reflects the scope of applicant's past bona fide operations from Tennessee origins.

"Those operations from origins other than in Tennessee clearly have been limited in scope and irregularly and infrequently performed, and as such do not entitle applicant to the benefits of the 'grandfather' clause. Therefor, to this extent the application will be denied."

With respect to destination points allowed, the evidence supports the report of the Commission and the Court is of the opinion that the Commission followed the proper standards and made adequate findings in reaching its conclusions as to those points. But other points were excluded by the Commission because of its rejection of evidence of 1956 shipments.

Plaintiffs submitted proof of operation during 1956, 1957, 1958 and 1959 to show the points served and changes in nature of traffic. The Commission limited the evidence to shipments hauled in 1957, 1958 and 1959:

"We have not listed in the appendixes any shipments handled in 1956, because such shipments are too remote with respect to the statutory date to have probative value in this proceeding. See Refrigerated Dis-

patch Common Carrier Application, 83 M.C.C. 411." (Commission's Report, Footnote 6, p. 351.)

The changing and unpredictable nature of the traffic which were characteristics of this industry made consideration of the 1956 shipments crucial. The record reveals that the bulk of the traffic in frozen vegetables, berries and fruits moves after May 1 of each year, mainly during the summer and early fall. The elimination of 1956 shipments restricted plaintiffs to proof of only one principal movement prior to May 1, 1958. The Commission required proof of operations between the same points at least once before and once after May 1, 1958 and by not considering the 1956 shipments, plaintiffs were denied their statutory right to prove that the origin and destination points in their bona fide operations change from year to year; that these changes occur frequently and that such changes are attributable to the special characteristics of the traffic.

The Commission, in ruling out consideration of the 1956 shipments deprived plaintiff in 025 of a basis for consideration, whether service to 34 points [4] throughout the scope of their operation should be continued. Eight of these points were served in 1956 and again in the summer of 1959. In numerous instances, operations were continued to other nearby points in the same States. Albany, Troy, Binghamton, White Plains, Newburgh, Rochester and New York City were served in 1956, but in 1957 and 1958, prior to May 1, plaintiff was requested to serve only the facilities at Rochester and New York City. Subsequent to May 1, 1958, shipments were again delivered to Rochester, New York City and Albany, and in addition thereto Syracuse, Buffalo, Barker and Brockport. The Examiner recommended a grant of authority to New York State, but by the elimination by the Commission of the 1956 shipments from the evidence, plaintiff's operations appeared to be severely restricted when actually they were not and the Commission granted authority only to Rochester and points in the New York, N. Y., Commercial Zone.

We think the characteristics of the service and the pattern of operation in New York State by applicant before and after May 1, 1958 were such as to show that plaintiff held itself out to serve the entire State of New York and that the Examiner was right in granting statewide authority in New York and that the Commission was wrong; that the Commission abused its discretion in the light of the characteristics of the service in ruling out the 1956 evidence and thereby deprived the plaintiff of a statutory right to continue to serve the eight points which were served in 1956 and again in 1959 and others of the 34 points listed in Footnote 4 which would be entitled to service under a proper application, to the facts of this case, of the standards which we have derived from a consideration of the characteristics of these businesses.

Plaintiff in 025 held itself out to transport frozen fruits, berries and vegetables at any point in Tennessee for delivery to any points in the States located in the Eastern part of the United States lying east of the Rockies from Minnesota to Texas. Plaintiff actually hauled all three commodities in mixed truck loads consist-

4. Montgomery, Ala.
Little Rock, Ark.
Bridgeport, Conn.
Tampa, Fla.
Indianapolis, Ind.
Lafayette, Ind.
Shreveport, La.
Baltimore, Md.
Worcester, Mass.
Quincy, Mass.
Dorchester, Mass.
Springfield, Mass.

Boston, Mass.
Fairmont, Minn.
Hopkins, Minn.
Minneapolis, Minn.
Kansas City, Mo.
Asbury Park, N. J.
Newark, N. J.
Clifton, N. J.
Camden, N. J.
Albany, N. Y.
Troy, New York

Binghamton, N. Y.
White Plains, N. Y.
Newburgh, N. Y.
Farrell, Pa.
Erie, Pa.
Pittsburgh, Pa.
Providence, R. I.
Lubbock, Texas
Norfolk, Va.
Madison, Wisc.
Bristol, Va.

ing mostly of vegetables, a smaller amount of berries and only a few shipments of fruit.

As previously indicated, the application was amended at the hearing by restricting the commodities to frozen berries and vegetables, but certain of the authority granted was limited to frozen berries.

It is our opinion that frozen fruits, frozen berries and vegetables possess the necessary similarities in transportation and marketing characteristics and are sufficiently related to justify the conclusion that they are "a whole class or classes of property" within the meaning of the Supreme Court's ruling in the case of United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971.

" * * * The Commission may not atomize his prior service, product by product, so as to restrict the scope of his operations, where there is substantial evidence in addition to his holding out that he was in 'bona fide operation' as a 'common carrier' of a large group of commodities or of a whole class or classes of property. There might be substantial evidence of such an undertaking though the evidence as to any one article was not substantial. The broad sweep of his prior service may indeed have made the carriage of any one commodity irregular and infrequent. Yet, viewed as a whole rather than as a group of separate and unrelated items, his prior activities may satisfy the test of 'bona fide operation' as a 'common carrier' within the scope of his holding out." United States v. Carolina Freight Carriers Corp., supra, pp. 483, 484, 62 S.Ct. p. 727.

These foods were processed in the same plants, required the same transport facilities and were delivered to warehouses having freezer facilities. Insofar as the parties held themselves out to carry these items, they should be treated as belonging to the same class. The fact that Garden withdrew its applica-

tion as to frozen fruits does not invalidate the tests to be applied. As the Supreme Court amplified in the Carolina Carriers case at page 484, 62 S.Ct. at page 727:

" * * * The questions are whether his service within the territory in question was sufficiently regular, and whether his coverage of commodities was sufficiently representative, to support a finding that he was in 'bona fide operation' as a 'common carrier' of the group of commodities, or of the class or classes of property, during the periods in question.

* * * * * *

" * * * But we conclude that there is no statutory warrant for applying to irregular route carriers a different or stricter test as to commodities which may be carried than is applied to regular route carriers. The difference between those types of carriers may well justify a sharp delimitation of the far flung territory which an irregular route carrier may profess to serve. But, once the territory has been defined, the statutory test of whether an applicant was a 'common carrier' by motor vehicle in 'bona fide operation' during the critical periods is the same for the irregular and the regular route carrier. * * * "

We think that Garden should be permitted to haul frozen berries and/or vegetables to any point within the scope of its operations.

" * * * Once the common carrier status of appellee had been established as respects those commodities, shipments to any parts of the authorized territory, or to any of the authorized points therein, should have been permitted, in absence of evidence that the appellee as respects carriage between specified points had restricted its undertaking to particular commodities. * * * " United States v. Carolina Freight Carriers Corp., supra, 487, 62 S.Ct. 728.

With respect to the return territory granted to applicants by the Commission, we are of the opinion that it is supported by substantial evidence, except as indicated hereafter as to Freezer. In reaching this conclusion, we recognize that plaintiffs' source of traffic for the return operations is necessarily irregular and infrequent.

What we have said as to Garden with respect to the inclusion of shipments made in 1956 and to the treatment of frozen fruits, berries and vegetables applies equally to Freezer.

### No. MC–118244

The rejection of the evidence of 1956 operations in MC–118244 deprived plaintiff of continuing to serve St. Paul and Minneapolis, Minnesota. However, as we have indicated in 025, we believe the characteristics of the traffic entitle Freezer to serve St. Paul and Minneapolis in Minnesota in 244. Only Hopkins was served in 1957 and subsequent to May 1, 1958 and only Hopkins was allowed as a destination point. St. Paul and Fairmont as well as Hopkins were served continuously after that date. There was no abandonment of operations as to these cities and the service to them was dictated by the irregular demands of the traffic rather than the intent of the plaintiff to limit service in the area.

We do not think the characteristics of the service and the pattern of operation in Minnesota are sufficient to justify statewide authority to that State. However, as we have indicated in 025, we believe the characteristics of the traffic entitle Freezer to serve St. Paul and Fairmont in Minnesota in 244.

We think the characteristics of the business properly applied dictate the granting of authority to operate from all points in Texas to all points in Tennessee.

### Private and For-Hire Operations

The Commission's order required the separation of plaintiffs' private and for-hire operations. This limitation upon their operations was imposed upon the traffic of both Garden and Freezer.

During the oral argument, the attorneys stated that there was no court decision on the question. The Commission, in imposing the restriction, said:

"Initially to be disposed of in No. MC–118244 is Gordon's assertion that the affinity between applicant's private and for-hire operations creates undesirable possibilities of unfair competitive practices and that this application should be denied in its entirety as being contrary to the principles of the national transportation policy. We cannot agree that applicant's dual position as a private and for-hire motor carrier necessitates a denial of its 'grandfather' application herein. The evil feared in situations where a carrier operates as a private as well as a for-hire carrier is that the carrier, by virtue of its private operations, has a guaranteed volume of traffic without expenses of solicitation and the like, and that, accordingly, it will be in a position to offer service at rates less than competing carriers. However, there is nothing in this record to suggest that applicant has engaged in, or intends to engage in unfair or discriminatory trade practices; and, furthermore, we have ample power to deal with instances of discrimination should they arise. Following our past practice in similar situations, we shall, however, in both proceedings impose certain conditions on the authority granted applicants requiring the segregation of their for-hire and private carriage operations. In this connection, applicant in the title proceeding argues that we are without the power to impose any such limitations on authority granted pursuant to a 'grandfather' application. We cannot agree. There is nothing in the Transportation Act of 1958, which relieves motor carriers which have been granted authority thereunder from conforming to our rules and regulations adopted in accordance with the precepts of the national transportation

policy, and we conclude that imposition of the aforementioned restrictions is necessary to enable us to properly regulate the motor carrier industry."

■ Plaintiffs contend that in so holding, the Commission deprived them of statutory rights contained in the "grandfather" clause in that their operations were carried on prior to May 1, 1958 and after May 1, 1958, without these restrictions, and that if they are deprived of carrying on private and for-hire haulage in the same loads, they will not continue with the same rights they possessed prior to the passage of the 1958 Transportation Act. In construing the "grandfather" clause in the "Motor Carrier Act of 1935", the Supreme Court said, this Act contemplated substantial parity between future operations and prior operations. Alton R. R. Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586. This parity would be lost if plaintiffs are required to separate their private and for-hire operations.

Mr. Harris, Chairman of the House Committee on Interstate and Foreign Commerce, said in connection with a proposal to liberalize the Act with respect to frozen fruits, berries and vegetables:

*⁄* * * * The bill provides for 'grandfather' rights so (sic) those common or contract carriers by motor vehicle which are now engaged in the transportation of these commodities. They will be permitted to continue the service they are now performing. Therefore, this industry would not be hindered or hampered in any way."

Section 7(c) of the Act spells out the standards to be applied by the Commission in disposing of "grandfather" applications, but there is nothing in this section that authorizes the restrictions imposed by the Commission in the present case. The requirement that applicant prove bona fide operations on and after May 1, 1958, sub-section (c), subjects applicants only to Section 210 of the Interstate Commerce Act which prohibits the dual control of a common and contract carrier unless the Commission finds that such control is consistent with the public interest.

■ This Section does not prohibit the control of a common or contract carrier by a shipper conducting private carrier operations. The Commission has viewed a shipper's control of or interest in a motor carrier applicant as bearing on the applicant's fitness to conduct the proposed operation and both common and contract carrier applicants must prove that they are fit, willing and able to conduct the operations.

The Commission has recognized that an applicant's "fitness" is not an issue in "grandfather" proceedings. The Commission, in imposing the restriction, apparently attempted to apply powers and standards which it may apply in application proceedings for new authority under Sec. 207 and 209 of the Interstate Commerce Act, but not in "grandfather proceedings."

■ Plaintiffs assert that if they should be required to segregate their private and for-hire operations that this would destroy their ability to continue to perform their bona fide operations that were conducted on the statutory date. The operations were primarily in less than truck load quantities consisting of a mixture of their own frozen foods and of frozen foods owned by, and carried for, others. Plaintiffs assert that the continuation of the practice of consolidating these small shipments into pooled truckload lots is essential to the continuation of their business, for without the combined volume of private and for-hire traffic, neither type of shipment can be moved economically. Segregation of these operations will drastically change their basic characteristics and thus not assure to plaintiffs the "substantial parity between future operations and prior bona fide operations" as required by the "grandfather" clause. We are of the opinion that plaintiffs have the right to continue to mingle their private and for-hire operations without restriction.

The findings and conclusions of the Commission in the respects heretofore indicated must be set aside and remanded to the Commission for further consideration in accordance with the views herein expressed. In all other respects, the findings and conclusions of the Commission are affirmed.

The parties will prepare an order in conformity with the opinion of the Court in this memorandum.