J. Edward JARMAN, an individual, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Civ. A. No. 13692.

United States District Court D. Maryland.

June 18, 1963.

William J. Augello, Jr., New York City, and John B. Robins, Salisbury, Md., for plaintiff.

Joseph D. Tydings, U. S. Atty., Baltimore, Md., Lee Loevinger, Asst. Atty. Gen., and John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., for defendant, United States.

Robert W. Ginnane, Gen. Counsel, and Betty Jo Christian, Atty., Interstate Commerce Commission, Washington, D. C., for defendant, Interstate Commerce Commission.

Before SOBELOFF, Circuit Judge, THOMSEN, Chief Judge, and NORTHROP, District Judge.

NORTHROP, District Judge.

This is an action to enjoin, set aside and annul certain orders of the Interstate Commerce Commission (hereafter called the Commission) from enforcing a report of January 23, 1961, denying a part of plaintiff's application for authority to continue operations in interstate commerce pursuant to Section 7 of the Transportation Act of 1958 (72 Stat. 573) and entitled J. Edward Jarman Common Carrier "Grandfather" Application, MC–118114, 84 M.C.C. 343, and to enjoin the Commission's orders of January 23, 1961, of June 29, 1961, denying his petition for reconsideration, and of January 24, 1962, denying his petition for further hearing.

The plaintiff claimed on the application, timely filed on December 9, 1958, that he had one tractor-trailer which transported on and prior to May 1, 1958, frozen fruits, frozen berries, frozen vegetables, and mixed shipments of fresh and frozen fish, seafoods, and poultry, over irregular routes, as follows:

(1) from points in Delaware and Maryland to points in Connecticut, Illinois, Indiana, Iowa, Kansas, Massachusetts, Michigan, Missouri, New Jersey, New Hampshire, New York, Nebraska, Ohio, Pennsylvania, Rhode Island, Wisconsin, and the District of Columbia;

(2) from points in Illinois, Minnesota, New Jersey, New York, and Pennsylvania to points in Delaware and Maryland; and

(3) between points in Delaware, Maryland, and Virginia and from points in Pennsylvania to points in New York.

After a hearing on July 10, 1959, before an examiner of the Commission, his findings (as summarized in the later report of Division 1 of the Commission, supra, at 344) were that

"* * * applicant was, on and continuously since May 1, 1958, in bona fide operation as a common carrier by motor vehicle, over irregular routes, of frozen fruits, vegetables and berries, (a) from Salisbury, Md., to points in New York, New Jersey, Pennsylvania, and Virginia, and to Boston, Mass., Chicago, Ill., East Hartford, Conn., and the District of Columbia, and (b) from Landover, Md., to New York, N. Y., Columbus, Ohio, and Chicago, Ill.; that he is entitled to a certificate authorizing the continuance of such operations; and that the application in all other respects should be denied."

Despite plaintiff's objections to the examiner's report, the subsequent report by the Commission's Division 1, issued with its accompanying order on January 23, 1961, was somewhat more restrictive than had been the examiner's recommendations. The report finds that plaintiff was "in bona fide operation on May 1, 1958, as a common carrier by motor vehicle, over irregular routes, of frozen fruits, vegetables, and berries" as follows:

| From | To |
| --- | --- |
| Salisbury, Md. | Boston, Mass. |
| " " | Worcester, Mass. |
| " " | Richmond, Va. |
| " " | Williamsburg, Va. |
| " " | Norfolk, Va. |
| " " | Buffalo, N. Y. |
| " " | New York, N. Y. |
| " " | Newburgh, N. Y. |
| " " | Philadelphia, Pa. |
| " " | Pittsburgh, Pa. |
| " " | Ephrata, Pa. |
| " " | E. Hartford, Conn. |
| " " | Chicago, Ill. |
| " " | Washington, D. C. |
| " " | New Jersey. |
| Landover, Md. | New York, N. Y. |
| " " | Columbus, Ohio |
| " " | Chicago, Ill. |
| " " | N. Abington, Mass. |
| " " | Lafayette, Ind. |
| " " | Indianapolis, Ind. |

This court on April 2, 1962, issued an order temporarily restraining the order which had been issued by the Commission pursuant to its opinion of January 23, 1961.

It should be noted that the Division did not find that service had been rendered back to Maryland, that it did not consider any locations in Delaware to have been either origin or destination points, that it treated Landover and Salisbury as separate points in considering the service from them to out-of-state localities, and that it did not consider either Trappe, Md., or Cambridge, Md., to have been origin or destination points.

The complaint invokes §§ 17(9), 205 (g), and 205(h) of the Interstate Commerce Act (49 U.S.C. §§ 17(9), 305(g), and 305(h)), § 10 of the Administrative Procedure Act (5 U.S.C. § 1009), and §§ 1336, 1398, 2284, and 2321 through 2325 of the Judicial Code (28 U.S.C. §§ 1336, 1398, 2284, and 2321–2325), from which provisions this court derives jurisdiction in this case. The plaintiff has met the requirement of § 17(9) of the Interstate Commerce Act that a suit to suspend a Commission decision may be brought only after an application for rehearing, re-argument, or reconsideration shall have been made and acted upon by the Commission.

Before passage of the Transportation Act of 1958 (P.L. 85–625, 85th Congress, 2d Session, approved August 12, 1958, 72 Stat. 568), truckers of frozen foods were exempt from the certification required by the Interstate Commerce Act of many types of carriers; § 203(b) (6) of the Act (49 U.S.C. § 303(b) (6)) made no distinction between such carriers and others carrying livestock, fish, or agricultural commodities which were not manufactured. Section 7(a) of the Transportation Act of 1958 withdrew frozen fruits, frozen berries, and frozen vegetables (as well as certain other products) from this category. Section 7(c) contained the "grandfather clause" under which plaintiff seeks authorization; it read in pertinent part:

"[I]f any person * * * was in bona fide operation on May 1, 1958, over any route or routes or within any territory, in the transportation of property for compensation by motor vehicle made subject to the provisions of part II of that [Interstate Commerce] Act by paragraph (a) of this section, in interstate or foreign commerce, and has so operated since that time * * * except * * * as to interruptions of service over which such applicant or its predecessor in interest had no control, the Interstate Commerce Commission shall without further proceedings issue a certificate or permit * * * authorizing such operations as a common or contract carrier by motor vehicle if application is made to the said Commission as provided in part II of the Interstate Commerce Act and within one hundred and twenty days after the date on which this section takes effect."

The plaintiff's essential dispute is not with the bare facts of past trips and truckloadings; the Commission relies primarily on the carriers' own records for this type of data. Rather, the complaint is directed toward the Commission's application of the statutory and decisional law to these facts. Judicial relief is granted by Sections 17(9) and 205(g) of the Interstate Commerce Act and by Section 10 of the Administrative Procedure Act, as already mentioned. Plaintiff's principal contentions are that, under the law, the Commission:

1. should have considered as origin territory a 75-mile radius of Salisbury, Maryland, which allegedly would include the towns of Salisbury, Landover, Cambridge, and Trappe, Maryland, and Clayton, Dover, and Georgetown, Delaware;

2. should have granted statewide authority to serve as destination territory from the origin territory just proposed, Connecticut, Delaware, Massachusetts, New Jersey, New York, Pennsylvania,

Virginia, Illinois, Indiana, Ohio, and the District of Columbia;[1] and

3. should not have denied, wholesale, permission for return operations from points outside Maryland and Delaware.

The second contention above is, of course, not unrelated to the first.

An additional, less substantive contention is that denial of plaintiff's petition for further hearing was unreasonable. Plaintiff urges that he had acquired pertinent additional evidence bearing particularly on requests, subsequent to May 1, 1958, by shippers for trips from points in Maryland and Delaware other than the two Maryland towns of Landover and Salisbury, and on return operations from Minnesota following that same date.

■ The plaintiff does not ask that this court make a determination of the authority which should be granted. Rather, he proposes that we remand the case to the Commission for a redetermination in line with what he deems to be the correct law. The court agrees that such a remand would be the appropriate remedy if it appears that the Commission has erroneously applied the law, Loving v. United States (W.D.Okla. 1940), 32 F.Supp. 464, 467, affirmed 310 U.S. 609, 60 S.Ct. 898, 84 L.Ed. 1387; United States v. Maher, 307 U.S. 148, 59 S.Ct. 768, 771, 83 L.Ed. 1162 (1939).

## I—Origin Territory

■ It is our impression that the basic facts in this case are undisputed. The plaintiff has produced a statistical compilation of some 797 shipments (over 40 percent of them in less-than-truckload quantities) aggregating over 8,000 tons, between January, 1956, and July, 1959. These shipments were almost entirely outbound, from four points in Maryland (Landover, Salisbury, Trappe, and Cambridge) and three points in Delaware (Georgetown, Dover, and Clayton). The total of seven points the plaintiff describes somewhat vaguely as "all lying within a radius of approximately 75 miles from Salisbury".[2] This court takes judicial notice that a radius of 75 miles from Salisbury would probably not include Landover,[3] and in view of the undisputed importance of Landover in the plaintiff's application, we would prefer to avoid the concept of radius altogether, and suggest the "area-wide-pattern-of-service" concept employed by the Commission itself in M & H Produce Co. Inc., Common Carrier "Grandfather" Application, 91 M.C.C. 183, 185. The facts of the plaintiff's business appear to make such a concept applicable to him.

On May 1, 1958, the plaintiff owned a single tractor-trailer combination, refrigerated for carrying frozen foods; he stated that by July 10, 1959, the date of the hearing, he had acquired a second such combination. The facts as presented by the plaintiff are that his principal shipper maintained a plant and cold-storage warehouse at Salisbury, but that this shipper was forced to utilize other such warehouses for storage at the remaining Maryland and Delaware points mentioned supra; that the storage and shipping points varied from year to year due to changes in market conditions, sales policies, crop-production, and a variety of factors peculiar to

1. It will be noted that the plaintiff has abandoned his application for authority to serve Iowa, Kansas, Michigan, Missouri, New Hampshire, Nebraska, Rhode Island, and Wisconsin from the Maryland-Delaware area. The government points out that permission is not necessary to serve Washington, D. C., from Landover, Maryland, because Landover is in the Washington commercial zone and consequently exempt under Section 203(b) (8) of the Interstate Commerce Act (49 U.S.C. § 303(b) (8)) ; permission has been given to plaintiff to serve Washington from Salisbury.

2. Opening Brief of Plaintiff, p. 14.

3. Not only is it doubtful that Landover would be within the 75-mile radius in question, but the court takes notice that such a radius would apparently reach to the environs of Baltimore, and would include several entire counties which the plaintiff apparently did not actually serve either before or after May 1, 1958.

the frozen food business; and that the transportation of frozen fruits, vegetables, and berries is marked by seasonal, as well as annual, fluctuations. The plaintiff further demonstrated that he moved a substantial number of shipments from one origin point to another; the largest such intra-warehouse movement being between Salisbury and Landover, but other such movements involving Cambridge, Maryland, and Georgetown, Dover and Clayton, Delaware. A few shipments originated by pickups at both Landover and Salisbury, although such multiple shipments are not claimed to have been normal.

This court is obviously not bound by the very recent decision in Winter Garden Company v. United States, 211 F. Supp. 280 (E.D.Tenn.1962), one of the first cases to deal with the "grandfather" clause involved in the present action. We recognize the correctness of the Commission's contention that several issues in that case are not involved in this one.[4] But a brief quotation from that opinion will show marked similarities to the facts in the present case:

"Plaintiffs' services are confined to points at which cold storage service facilities are located and these locations sometimes change from season to season.

"The traffic available to plaintiffs is limited to frozen fruits, berries and vegetables. These items are perishable, seasonal and are greatly dependent upon weather, crop and market conditions. Services rendered by the plaintiffs were primarily in less than truck load quantities, requiring multiple pick-ups and multiple deliveries, averaging, in the case of Garden, two or three, but occasionally running to seven stops, and at locations which changed from time to time.

"The originating points for the frozen fruit, berry and vegetable traffic constantly change, depending upon the availability of cold-storage freezer space and varying crop conditions. * * *

"Garden's authority was limited by the Commission, however, to Knoxville and Chattanooga as originating points. It has held itself out to serve all origins in Tennessee and its operations have followed the necessary storage point changes dictated by the shippers' requirements. * * *

"We think the proof shows that the characteristics of this applicant's operations during the critical period from points in Tennessee were such as to entitle it to statewide authority for outbound traffic and that the Commission in holding to the contrary acted arbitrarily and without supporting evidence."[5]

We do not suggest in the present case that the Commission is necessarily obliged to grant statewide authority for origin territory on the basis of the facts so far adduced. Countywide grants, for example, might be considered, M & H Produce Co., Inc., Common Carrier "Grandfather" Application, 86 M.C.C. 647, 650.[6] Whether the "area-of-service"

---

4. Two disputed points in Winter Garden were the Commission's refusal to include 1956 in the comparison with service after May 1, 1958, and its action in restricting authority in certain instances to frozen berries, to the exclusion of frozen vegetables. The Commission has in the present case considered 1956 as well as later years, and it has not attempted to exclude any of the categories of frozen foods for which Jarman has asked authority.

5. Winter Garden Company v. United States, supra, 211 F.Supp. at 286.

6. We note that Landover, Trappe, Cambridge, and Salisbury are all in different Maryland counties; Georgetown, Delaware, is in Sussex County, while Dover and Clayton are in Kent County, Delaware. For a grant of authority to serve an origin territory of five counties (of the State of Washington), see Refrigerated Truck Lines Common Carrier "Grandfather" Application, 86 M.C.C. 377, 379, approved without change in Neil B. Olmsted, etc. v. United States (W.D.Wash.), No. 5480.

concept which the Commission seems willing to espouse in other cases,[7] if applied here (as we think it should be) would draw in, as origin points, the Delaware towns of Dover, Clayton, and Georgetown is best left to the Commission to determine upon reconsideration. But such a concept cannot reasonably be applied to the plaintiff's operations at Landover and Salisbury without involving the two Maryland points of Cambridge and Trappe, which lie directly on the main highway between them. Moreover, plaintiff's recent revival of business at Cambridge, if duly substantiated, would in our view quite possibly justify a finding of service before and after May 1, 1958, even without reliance on "area-of-service" or—to borrow a phrase from W. J. Digby, Inc., Common Carrier "Grandfather" Application, 89 M.C.C. 122, 124—"semblance of oneness". However the Commission may resolve these specific questions, we are of the opinion that it should apply in this case the test which was used to find an area-wide pattern in Virgil M. Jenkins, Common Carrier "Grandfather" Application, No. MC–118115, May 11, 1960, that of "widespread service to a representative number of points".

## II—Destination Territory

We have expressed our belief that the facts of the plaintiff's frozen food transport business compel area-wide authority for origin territory, although the Commission, not this court, should determine just which points in Maryland, and possibly in Delaware, the bounds of the origin territory should include. Once determined by the Commission, we believe that the service which can be shown on and after May 1, 1958, from that area should determine the points which will comprise the destination territory. Since the Commission, with its experience and expert knowledge, should fix the origin territory, the task of fixing the destination territory necessarily also is the Commission's. We would at this time only point out the inadequacy which appears in the destination authority granted by the Commission in this case.

The plaintiff's allegations, and the testimony on his behalf at the hearing of July 10, 1959, appear uncontested that the destination points for shipments of frozen foods outbound from Maryland and southern Delaware are, by the nature of the business, as changeable as are the shipping points. For any real recognition of this in the opinion of Division 1, we search in vain. Instead, Landover and Salisbury shipments have apparently been subjected to a simple "before-and-after" test. This means that, if a destination was served both before and after May 1, 1958, from Salisbury, authority has typically been granted for service to that point from Salisbury; by the same token, no service from Landover would be authorized on the basis of past trips from Salisbury, and past service from other Maryland and Delaware points has likewise been excluded from the determination altogether.

Several examples may make the point plainer. Service from Salisbury is authorized to Boston and Worcester, Massachusetts, while the only service authorized from Landover to Massachusetts is that destined for North Abington. Behind each of these authorizations was a record which showed at least one instance of service before May 1, 1958, and at least one instance after. No authority was granted for service from Landover to Boston, apparently because plaintiff's two trips over this route were both made after May 1, 1958. Similarly, no authority was granted from Salisbury to North Abington, although three trips had been recorded, all of them before the crucial date. The plaintiff contends that traffic destined to East Hartford, Connecticut, originated at Salisbury in 1956, 1957, and in 1958 up to October 14, while in 1959 the customer(s) in East Hartford relied on storage facilities at Landover. As a result of the Commission's method of determining service, authority has been granted from Salisbury to East Hartford but not from Landover.

---

7. Doris Long Common Carrier "Grandfather" Application, 81 M.C.C. 689.

It appears to us that anomalous results such as that which apparently was reached in the case of East Hartford could be avoided by treating at least Salisbury and Landover, and possibly other Maryland, and even Delaware, localities as a single origin by which to measure service on and after the critical date. The facts of the frozen food market served by the plaintiff make this concept logical, and significant precedents are not lacking. The plaintiff points to Alton R. Co. v. United States, 315 U.S. 15 at 21, 62 S.Ct. 432 at 436, 86 L.Ed. 586 (1942), where it was said:

"While the test of 'bona fide operation' within a specified 'territory' includes 'actual rather than potential or simulated service' (McDonald v. Thompson, 305 U.S. 263, 266 [59 S.Ct. 176, 178, 83 L.Ed. 164]), it does not necessarily restrict future operations to the precise points or areas already served. The characteristics of the transportation service rendered may of necessity have made trips to any specified locality irregular or sporadic. And they may likewise have restricted prior operations to but a few points in a wide area which the carrier held itself out as being willing and able to serve."

Apt, too, is plaintiff's quotation from another leading "grandfather" case under the Motor Carrier Act of 1935, United States v. Carolina Freight Carriers Corp., 315 U.S. 475 at 487, 62 S.Ct. 722 at 728, 86 L.Ed. 971 (1942), where the Court said:

"The record is plain that appellee held itself out as being willing and able to carry a wide variety of commodities on its return trips to its home base in North Carolina. And the record shows that it carried many different kinds of articles on those southbound journeys. But the Commission drastically limited its rights in that regard. Thus it was permitted to carry beer from New-ark, N. J. to two points in North Carolina, but not from Baltimore, Md. In absence of evidence that it had thus limited its undertaking as respects beer, the mere fact that it previously had not carried beer from Baltimore would be immaterial. If it had established by substantial evidence that it was a 'common carrier' of beer on southbound trips, it would be entitled to carry it from any of the northern points to any of the southern destinations. For there was no evidence in this case that it had restricted its undertaking as respects beer to shipments from Newark, unless the fact that it had carried beer only from that point is to be conclusive. But to say that that was conclusive or controlling would be to disregard the natural and normal course of business shown by this record. * * * [W]here [appellee] was actively soliciting whatever it could get at any of the points, it does violence to its common carrier status to make the origin or destination of future shipments conform to the precise pattern of the old. Such a pulverization of the prior course of conduct changes its basic characteristics. There is no statutory sanction for such a procedure."

An obvious distinction between Carolina and the present case is that here we are not concerned with any one particular product or species of product. But the concern in Carolina with "holding out" is of a different order, and is a matter highly relevant to our own case. It will be remembered that, strictly speaking, the test under the Transportation Act of 1958 is "in bona fide operation * * * except * * * as to interruptions of service over which such applicant or its predecessor in interest had no control * * *" on and after May 1, 1958.[8] No one can well deny that instances of actual service both before and after the critical date between two

8. Section 7(c) (Public Law 85–625, approved August 12, 1958, 72 Stat. 573.)

given points are normally strong evidence of "bona fide operation". Yet the Commission and the courts have long conceded that a holding-out to provide service, when accompanied by some representative service, may also be evidence of operation. As was said in the Carolina case, 315 U.S. at 483–484, 62 S.Ct. at 727:

"The Commission may not atomize his prior service, product by product, so as to restrict the scope of his operations, where there is substantial evidence in addition to his holding out that he was in 'bona fide operation' as a 'common carrier' of a large group of commodities or of a whole class or classes of property. There might be substantial evidence of such an undertaking though the evidence as to any one article was not substantial. The broad sweep of his prior service may indeed have made the carriage of any one commodity irregular and infrequent. Yet, viewed as a whole rather than as a group of separate and unrelated items, his prior activities may satisfy the test of 'bona fide operation' as a 'common carrier' within the scope of his holding out."

In Alton, supra, the Supreme Court adopted the words of the Commission in William J. Wruck Common Carrier Application, 12 M.C.C. 150 (1938) at 151–152:

"Calls for service between the same points are seldom repeated. Traffic is not regular in any given direction. What may be of infrequent but fairly regular business to or from a certain State for a small carrier may be only sporadic business for a large carrier; consequently, a frequency of services that amount to 'grandfather' clause rights in the case of the former could conceivably be inadequate in the case of the latter. It would be an impractical solution to carve out oddly shaped areas for service based solely on the frequency of service; consideration must also be given to the general territory served under the holding-out, even if the business in some States may not equal that in other States in the territory."

The Commission, despite testimony (again, substantially uncontradicted) at the hearing of July 10, 1959, as to the plaintiff's holding-out of service and the effect of his small size in preventing him from carrying as many shipments as were potentially available, largely ignored both factors. We feel that the principles enunciated in Carolina and Alton, while they specifically referred to the "grandfather" clause of the Motor Carrier Act of 1935,[9] are equally as controlling in cases arising under the similar clause in the Transportation Act of 1958. The Commission would apparently agree. Doris Long Common Carrier "Grandfather" Application, 81 M.C.C. 689, 692 (1959). We agree with the plaintiff's contention that to base destination au-

9. 49 U.S.C. § 306(a) (1):
"Except as otherwise provided in this section and in section 310a of this title, no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operation on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations: *Provided, however,* That, subject to section 310 of this title, if any such carrier or predecessor in interest was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, or if engaged in furnishing seasonal service only, was in bona fide operation on June 1, 1935, during the season ordinarily covered by its operation and has so operated since that time, except in either instance as to interruptions of service over which the applicant or its predecessor in interest had no control, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate was made * * * within one hundred and twenty days after October 1, 1935 * * *."

thority, as the Commission apparently has, on a point-to-point analysis of shipments from each separate shipping point used in Maryland and Delaware is simply a fresh application of the "pulverization" forbidden by Carolina long ago in a different factual situation.

■ As regards destination territory, we limit ourselves to holding that authority from all points in the origin territory is to be determined by the total bona fide outbound operation from all those points on and after May 1, 1958. We have of course already held that the origin territory is for the Commission to determine upon reconsideration. Having stated the principle we believe should govern the grant of authority for destination territory, we leave it to the Commission to decide the extent of the grant.

We would add only a few remarks before leaving the subject of destination territory. We do not, by using the term "territory" here, suggest that the Commission should necessarily grant additional *statewide* destination territory. This court views favorably the statewide authority already granted in the case of New Jersey, and in line with our holding this authority should now be granted to service from Landover and from whatever points and/or areas the Commission decides should comprise the origin territory. In the case of New York, the chief result of reconsideration might be to extend to the whole origin territory authority to serve Buffalo and Newburgh, to which points the plaintiff has been authorized service only from Salisbury. Looking to a third example, although service to Ohio so far authorized has been only between Landover and Columbus, there consideration of service to the additional points of Cincinnati, Athens, Akron, Cleveland, Dayton and Toledo, which our holding makes mandatory, might result in the granting of statewide authority for that state. While we do not require such a result in advance, we would add that the plaintiff seems to make a telling point by his assertion that statewide authority to serve Ohio seems to have been granted to the applicant in

Midwest Emery Freight System, Inc., "Grandfather" Application, MC–114019 (Sub. No. 23), January 14, 1962, on a considerably weaker showing of service.

### III—Return Operations

The Hearing Examiner and the Commission agreed in their rejection of the plaintiff's application for authority for return service to the Maryland-Delaware area. This rejection was presumably based on absence of service before and after May 1, 1958. Instances of return shipments were not totally lacking. There were some fifteen shipments from points in various states back to either Salisbury or Landover. In only two instances does it appear that, at least up to the date of the hearing, there was any out-of-state point from which shipments had been made to Maryland or Delaware both before and after the critical date; we refer to Fairmont, Minnesota, from which there was one shipment before May 1, 1958, and two after, all destined for Salisbury, and to Bridgeton and Seabrook, New Jersey, which are said to be in the same commercial zone.

■ Considering the great number of outbound shipments (some 775) during the period considered by the examiner and the Commission, in contrast to return shipments totaling only some fifteen, we do not propose to order the Commission to grant blanket authority for return service. But several considerations impel us to hold that reconsideration of the denial of return authority is in order.

1. During the hearing before this court, it was forcefully called to our attention that, in the case of Wilson Freight Forwarding Co., Common Carrier "Grandfather" Application, MC–13123 (Sub. No. 21), October 3, 1960, return authority from Fairmont, Minnesota, to Salisbury, Maryland, was granted on the basis of a single trip before the critical date and two after it; in other words, on the same basis on which authority to the plaintiff here was denied. We note also that in Wilson the applicant owned some 126 pieces of refrigerated equipment, and we would assume that its

operation was conducted on a vastly larger scale than the plaintiff's. Thus authority appears to have been granted to a direct competitor of the plaintiff in complete disregard of the principle (appearing in our quotation from Alton R. Co. v. United States, supra) that an operation may be found in the case of an applicant whose small size might explain what would otherwise be a record of quite irregular service. We do not dispute the general correctness of the Commission's proposition that an unjustified former decision would not warrant a mistake, in a later case, for the sake of consistency. But this is no satisfactory answer in the present case. We expect the Commission, in its reconsidered decision, either to grant authority for return service from Fairmont or to explain on what basis it denies such authority.

2. It has come to our attention that, since the hearing on July 10, 1959, substantial return service from Fairmont may have been rendered. Upon reconsideration, any evidence of this or other service which might tend to change the picture of scant or non-existent return operations should be taken into account. While the Commission may of course justly question the relevance of shipments which follow a long interval without service, we suggest that it also consider whether the peculiarities of the frozen food traffic might justify some interruptions. We believe that the allowance in Section 7(c) of the Transportation Act of 1958 for "interruptions of service over which such applicant * * had no control" may contemplate just this situation.

3. In line with views already stated supra, any consideration of return service from out-of-state points should take into account shipments from any such point to the whole origin area (as that area shall be determined by the Commission). Likewise, a grant (if any is made, on reconsideration) of authority for return service from any out-of-state point shall be authority to the whole origin area. While this is not to require that return authority, if granted, would need

to be from out-of-state *areas*, we have already mentioned that Bridgeton and Seabrook, New Jersey, are in the same commercial zone, and it would seem appropriate to consider those towns together.

### IV—Procedure on Remand

■ The "grandfather" clause in Section 7(c) of the Transportation Act of 1958, while it required filing of an application within 120 days after the clause took effect, set no cut-off point for evidence of service rendered after May 1, 1958. The test would therefore seem to be one of relevance, and in determining the admissibility of later service the Commission faces a problem quite like that in Winter Garden Co. v. United States, supra, where one issue was whether 1956 service occurred too long before May 1, 1958. The defendants strongly urge that denial of the plaintiff's Petition for Leave to File Petition for Re-Opening and Further Hearing (filed January 23, 1961) was a reasonable exercise of the Commission's discretion. Both plaintiff and defendants appeal to the criteria stated in Yourga v. United States, 191 F.Supp. 373, 377 (W.D.Pa. 1961). We are not disposed to attempt to improve on the test in Yourga. We would hesitate to hold that a rehearing would be justified in the present case, if the Commission's decision appeared sound on the basis of all information which it had before it. In saying this, we do not forget plaintiff's contention that, because of the exemption formerly existing, he had unusual difficulty in making his initial compilation of data. We are more concerned, however, that the remand afford a true picture of the traffic since the hearing of July 10, 1959, to the extent that evidence of shifts in it might (in the words of Yourga, supra) "produce a different result". We refer particularly to suggestions made at the hearing of recent increases in plaintiff's traffic at Cambridge, Maryland, and Fairmont, Minnesota.

■ We are not unmindful of the principle that an administrative proceeding must eventually come to an end. To

permit indefinitely re-openings would frustrate this goal, but such re-opening is, we think, justified in the present case because of the necessity for a thorough reconsideration which would exist even if plaintiff were not allowed to present additional evidence.

The findings and conclusions of the Commission in the respects heretofore indicated must be set aside and remanded to the Commission for rehearing and further consideration in accordance with the views herein expressed.

The parties will prepare an order in conformity with the opinion of the court in this memorandum.