**LESTER C. NEWTON TRUCKING COMPANY, a corporation, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 2508.**

United States District Court
D. Delaware.

March 7, 1967.

See also D.C., 209 F.Supp. 600.

H. James Conaway, Jr., of Young, Conaway, Stargatt and Taylor, Wilmington, and H. Charles Ephraim, Washington, D. C., for plaintiff.

Alexander Greenfeld, U. S. Atty., Wilmington, John H. D. Wigger, Dept. of Justice, and Donald F. Turner, Washington, D. C., for defendant, the United States.

Robert W. Ginnane, Gen. Counsel, Betty Jo Christian and John E. Faulk, Washington, D. C., for defendant, I.C.C.

Before SEITZ, Circuit Judge, WRIGHT, Chief District Judge and STEEL, District Judge.

SEITZ, Circuit Judge.

Plaintiff corporation Lester C. Newton Trucking Company ("Newton") brings this action to set aside an order of the Interstate Commerce Commission and to remand the proceedings to the Commission for interpretation or amendment of its certificate of public convenience and necessity to include authority "enabling continued complete service by it throughout the territory in which it operates" as a motor carrier of frozen fruits, frozen berries, and frozen vegetables.[1] This is the decision of the district court which has jurisdiction under 28 U.S.C.A. § 1336 and which is composed of three judges as required by 28 U.S.C.A. § 2325 and as constituted pursuant to 28 U.S.C.A. § 2284.

The United States and the Interstate Commerce Commission, defendants, admit that Newton as required by 49 U.S.C.A. §§ 17(9), 305(g) and (h) has exhausted its administrative remedies through proceedings begun back in 1958. Newton filed with the Commission a "grandfather" application under § 7(c) of the Transportation Act of 1958 (P.L. 85–625; 72 Stat. 568), and later a second application pursuant to 49 U.S.C.A. § 307 seeking an extension of its authority in the event it was not satisfied with the scope of its existing authority as determined in the "grandfather" proceedings. The "grandfather" and extension proceedings were consolidated and division 1 of the Commission granted Newton limited authority under the "grandfather" provision (84 M.C.C. 759). Division 1 also granted certain new authority in the extension proceedings, but then reversed itself and denied Newton's extension application in its entirety (89 M.C.C. 269). Newton thereupon filed the present action. Thereafter, the Commission on its own motion reconsidered its prior orders, modifying the order on Newton's "grandfather" application and again denying Newton's extension application (98 M.C.C. 702). Still not satisfied, Newton filed a supplement to its original complaint by which it sought to set aside the latest Commission order. It is that order we now consider.

Newton advances three arguments in support of its contention that the Commission erred in refusing to grant broad authority for transportation of frozen fruits, berries, and vegetables throughout some sixteen Eastern states. Newton first declares that its present certificates should be construed to grant authority to transport frozen fruits, berries, and vegetables not only under the commodity descriptions "general commodities" and "frozen foods", as the Commission held, but also under the headings of "agricultural commodities" and "farm produce", which the Commission denied. If we accepted this first argument that Newton's present certificates already

1. A certificate of public convenience and necessity issued by the Interstate Commerce Commission is a prerequisite to interstate operations as a common carrier by motor vehicle in the transportation of all commodities unless the transportation is specifically exempt from Commission regulation. 49 U.S.C.A. § 306(a) (1).

authorize the desired full scope of transportation, it would of course become unnecessary to proceed further to Newton's second and third arguments under the "grandfather" and extension provisions, respectively.

Newton's first argument based on its outstanding certificates requires reference to § 203(b) (6) of the Interstate Commerce Act. This section excepted from regulation under the Act

> "motor vehicles used in carrying property consisting of * * * agricultural * * * commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation."

The Interstate Commerce Commission adopted a strict construction of this exception in two of its aspects. First, the Commission interpreted the exemption to apply only to the carrying of agricultural commodities in vehicles never used for carrying non-exempt products (i. e., in vehicles which were not "tainted"). Second, the Commission interpreted the exemption to apply only to agricultural commodities essentially in their natural state.

The courts, however, adopted a more liberal approach toward this exception. As to the first aspect, the courts held that the exemption extended to all transportation of exempt agricultural commodities even in "tainted" vehicles except in mixed loads with non-exempt products. Interstate Commerce Commission v. Dunn, 166 F.2d 116 (5th Cir. 1948); Interstate Commerce Commission v. Service Trucking Co., Inc., 186 F.2d 400 (3rd Cir. 1951). This judicial interpretation has not been altered by later judicial or Congressional developments and remains the law today. As to the second aspect, the courts held in a series of decisions that various degrees of processing did not remove agricultural products from the agricultural commodities exception. For example, it was held that the exemption covered otherwise exempt agricultural commodities in a fresh frozen state. Home Transfer & Storage Co. v. United States, 141 F.Supp. 599 (D.C.Wash.1956), affd. per. cur., 352 U.S. 884, 77 S.Ct. 129, 1 L.Ed.2d 82 (1956); Frozen Food Express v. United States, 148 F.Supp. 399 (D.C.Texas 1956), affd. per cur. 355 U.S. 6, 78 S.Ct. 38, 2 L.Ed.2d 22 (1957).

In order to halt the continued expansion of the agricultural commodities exemption and to return to regulation some eleven items including frozen fruits, berries, and vegetables, Congress passed the Transportation Act of 1958.[2] A saving clause was provided to give effect to certain certificates which the Commission had issued under its assumption of jurisdiction but which contrary judicial decisions prior to the Transportation Act had held were not required.[3]

2. Section 7(a) provides as follows: "Clause (6) of subsection (b) of section 203 of the Interstate Commerce Act, as amended, is amended by striking out the semi-colon at the end thereof and inserting in lieu thereof a colon and the following: '*Provided,* That the words "property consisting of ordinary livestock, fish (including shell fish), or agricultural (including horticultural) commodities (not including manufactured products thereof)" as used herein shall include property shown as "Exempt" in the "Commodity List" incorporated in ruling numbered 107, March 19, 1958, Bureau of Motor Carriers, Interstate Commerce Commission, but shall not include property shown therein as "Not exempt": *Provided further, however,* That notwithstanding the preceding proviso the words "property consisting of ordinary livestock, fish (including shell fish), or agricultural (including horticultural) commodities (not including manufactured products thereof)" shall not be deemed to include frozen fruits, frozen berries, frozen vegetables, cocoa beans, coffee beans, tea, bananas, or hemp, and wool imported from any foreign country, wool tops and noils, or wool waste (carded, spun, woven or knitted), and shall be deemed to include cooked or uncooked (including breaded) fish or shell fish when frozen or fresh (but not including fish and shell fish which have been treated for preserving, such as canned, smoked, pickled, spiced, corned or kippered products);'."

3. Section 7(b) provides as follows: "Unless otherwise specifically indicated therein, the holder of any certificate or

In addition, a "grandfather" clause was provided to protect carriers who had been engaged without certificates of authority in the *bona fide* transportation of commodities theretofore exempt from regulation but thereafter to be subject to the Commission's jurisdiction.[4]

The specific problem raised by Newton's first argument is to determine as a matter of statutory construction of section 7(b) of the Transportation Act of 1958 the extent to which Newton may transport frozen fruits, berries, and vegetables under the certificates it held before the effective date of the Act in 1958. In the 1930s Lester C. Newton, the proprietor of the business which later was incorporated, obtained a certificate authorizing the transportation of numerous special products and agricultural commodities. After the development of processes for the freezing of foods, Newton in the early 1940s sought permission to transport fresh frozen berries, fruits and vegetables and other frozen products under its then existing "agricultural commodities" authority. In Newton Extension-Frozen Foods, 43 M.C.C. 787 (1944), the Commission denied that these frozen items were exempt agricultural commodities, but granted Newton certain new authority to transport frozen products under "general commodities" and "frozen foods" clauses. It is this "general commodities" and "frozen foods" authority which Newton under the Commission's construction of § 7(b) retains after the Transportation Act of 1958 removed the exemption of frozen fruits, berries and vegetables.

Newton argues that a re-evaluation of its certificates is required as a result of the judicial interpretations of the agricultural commodities exemption subsequent to the Commission's ruling in the Newton extension case of 1944. Newton

permit heretofore issued by the Interstate Commerce Commission, or hereafter so issued pursuant to an application filed on or before the date on which this section takes effect, authorizing the holder thereof to engage as a common or contract carrier by motor vehicle in the transportation in interstate or foreign commerce of property made subject to the provisions of part II of the Interstate Commerce Act by paragraph (a) of this section, over any route or routes or within any territory, may without making application under that Act engage, to the same extent and subject to the same terms, conditions and limitations, as a common or contract carrier by motor vehicle, as the case may be, in the transportation of such property, over such route or routes or within such territory, in interstate or foreign commerce."

4. Section 7(c) provides as follows: "Subject to the provisions of section 210 of the Interstate Commerce Act, if any person (or its predecessor in interest) was in bona fide operation on May 1, 1958, over any route or routes or within any territory, in the transportation of property for compensation by motor vehicle made subject to the provisions of part II of that Act by paragraph (a) of this section, in interstate or foreign commerce, and has so operated since that time (or if engaged in furnishing seasonal service only, was in bona fide operation on May 1, 1958, during the season ordinarily covered by its operations and has so operated since that time), except in either instance as to interruptions of service over which such applicant or its predecessor in interest had no control, the Interstate Commerce Commission shall without further proceedings issue a certificate or permit, as the type of operation may warrant, authorizing such operations as a common or contract carrier by motor vehicle if application is made to the said Commission as provided in part II of the Interstate Commerce Act and within one hundred and twenty days after the date on which this section takes effect. Pending the determination of any such application, the continuance of such operation without a certificate or permit shall be lawful. Any carrier which on the date this section takes effect is engaged in an operation of the character specified in the foregoing provisions of this paragraph, but was not engaged in such operation on May 1, 1958, may under such regulations as the Interstate Commerce Commission shall prescribe, if application for a certificate or permit is made to the said Commission within one hundred and twenty days after the date on which this section takes effect, continue such operation without a certificate or permit pending the determination of such application in accordance with the provisions of part II of the Interstate Commerce Act."

contends that the moment before the effective date of the Act the "agricultural commodities" clause in its certificates included frozen fruits, berries, and vegetables. Therefore, Newton concludes, it may continue to engage in the transportation of these frozen products under its "agricultural commodities" and "farm produce" authorities which are preserved by § 7(b).

The Commission responds to Newton's argument by attacking the proposition that the moment before the effective date of the Act the "agricultural commodities" clause in Newton's certificates encompassed frozen fruits, berries, and vegetables. Division 1 argued that Newton's "agricultural commodities" certificates were issued at a time when frozen fruits, berries, and vegetables were not considered to be within that class:

> "In view of this Commission's past interpretation of Section 203(b) (6) of the act, there is no doubt but that Newton's certificates authorizing the transportation of agricultural commodities or farm produce were not, at the time of their issuance, intended to authorize the transportation of frozen fruits, berries, or vegetables." (84 M.C.C. 759, 768, confirmed 98 M.C.C. 702, 706).

The implication of the Commission's argument is that "agricultural commodities" certificates would be saved by section 7(b) if issued after the 1956 judicial decisions which held that frozen fruits, berries, and vegetables were within that class. In fact, the Commission has so held, citing the Newton proceedings, in Chesapeake Motor Lines, Inc., Common Carrier "Grandfather" Application, 89 M.C.C. 237 (1962).

We find some difficulty in accepting the Commission's interpretation that the coverage of the "agricultural commodities" class remains fixed as of the time of issuance of such a certificate. "Agricultural commodities" are those products, whatever they might be at any point in time, which are exempt under § 203(b) (6) of the Interstate Commerce Act when carried in straight loads. Therefore, the purpose of a Commission "agricultural commodities" certificate can only be to authorize the transportation of these items in mixed loads with non-exempt goods.[5] As judicial or legislative changes are made in the items encompassed within the "agricultural commodities" exemption of the Interstate Commerce Act, it is arguable that there are corresponding changes in the coverage of "agricultural commodities" certificates. Accordingly, it might well be concluded that the moment before the effective date of the Transportation Act of 1958 Newton's "agricultural commodities" and "farm produce" authorities permitted transportation of frozen fruits, berries, and vegetables in mixed loads with non-exempt products.

However, we find it unnecessary to resolve this issue as to the coverage of Newton's "agricultural commodities" certificates. Assuming *arguendo* that frozen fruits, berries, and vegetables are included, we conclude from the language and legislative history of the Transportation Act of 1958 that § 7(b) does not save this "agricultural commodities" authority to haul frozen fruits, berries, and vegetables in mixed loads with non-exempt products.

Section 7(b), like section 7(c), refers to the "transportation * * * of property made subject to the provisions of part II of the Interstate Commerce Act by paragraph (a) of this section." Thus, we think the Commission reached the correct conclusion that Newton could continue the transportation of frozen fruits, berries, and vegetables in straight loads under certificates

5. "It has been since 1935, and it is now, our intention to use the term 'agricultural commodities' for the purpose of authorizing the transportation of commodities which are 'partially exempt' from regulation under section 203(b) (6) in those instances wherein the transportation is not actually 'exempt' from economic regulation." (84 M.C.C. 759, 768, confirmed 98 M.C.C. 702, 706). See also Penn-Dixie Lines, Inc., Extension-Philadelphia, 78 M.C.C. 188, 189 (1958).

authorizing the transportation of "general commodities" and "frozen foods". Such certificates authorize the transportation of "property made subject to" the Interstate Commerce Act because the transportation in straight loads of certain "frozen foods" and "general commodities" had been held to be exempt by the courts and was made subject to regulation by the Transportation Act of 1958. By the same token, we believe the Commission reached the correct conclusion that Newton could not continue the transportation of frozen fruits, berries, and vegetables in mixed loads with non-exempt products under certificates authorizing the transportation of "farm produce" and "agricultural commodities". Such certificates do not authorize the transportation of "property made subject to" the Interstate Commerce Act because the transportation of "farm produce" and "agricultural commodities" in mixed loads with non-exempt products had not been held to be exempt by the courts but was already regulated prior to the Transportation Act of 1958.

The legislative history of the Transportation Act of 1958 also supports the conclusion that section 7(b) did not save Newton's authority to transport frozen fruits, berries, and vegetables in mixed loads with non-exempt products under its "farm produce" and "agricultural commodities" certificates. House Report No. 1922 indicates that the amendment of 49 U.S.C.A. § 303(b) (6) "freezes the so-called agricultural exemption from motor-carrier regulation by the Commission to the present list of exemptions, except for a roll-back on frozen fruits, frozen berries, frozen vegetables * * * (i. e., these articles would no longer be exempt)." 1958 U. S. Code Cong. and Admin. News, p. 3457. Other passages from this report make it clear that the Transportation Act of 1958 was intended to "overrule" the *Home Transfer* and *Frozen Food* cases which had exempted frozen fruits, berries, and vegetables when carried in straight loads. There is absolutely no indication that the Act intended to deal with the regulation of otherwise exempt commodities when transported in mixed loads with non-exempt commodities.

The conclusion we reach, then, is that Newton may continue the transportation of frozen fruits, berries, and vegetables in straight loads to the extent the Commission authorized such transportation under the "general commodities" and "frozen foods" descriptions in its certificates issued before 1958. Other rights claimed by Newton must find their support, if at all, not under the "agricultural commodities" and "farm produce" clauses of its certificates, but under the "grandfather" or extension provisions.

Newton's second argument is that the Commission unduly restricted its grant of authority under the "grandfather" provision, § 7(c) of the Transportation Act of 1958, as a result of an inappropriate statistical analysis of the carrier's past shipments and a disregard of the territorial nature of its service and the transportation characteristics of the frozen foods involved.

The governing legal principles are clear. In Alton R. Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586 (1942), the Supreme Court stated the basic propositions which have often been reaffirmed:

> " 'Territory' is not a word of art. The characteristics of the transportation service involved as well as the geographical area serviced are relevant to the territorial scope of the operations which may be authorized under the 'grandfather clause'. While the test of 'bona fide operation' within a specified 'territory' includes 'actual rather than potential or simulated service' (McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164), it does not necessarily restrict future operations to the precise points or areas already served. The characteristics of the transportation service rendered may of necessity have made trips to any specified locality irregular or sporadic. And they may likewise have restricted prior operations to but a few points in a wide area which the carrier

held itself out as being willing and able to serve." (315 U.S. 15, 20–21, 62 S.Ct. 432, 436).

In addition to repeating these principles, the Court in United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971 (1942), stated:

"The Act provides the test of 'bona fide operation'. That standard carries the connotation of substantiality. It also makes clear that a holding out to serve a specified area is not alone sufficient. * * * Substantial, as distinguished from incidental, sporadic, or infrequent, service is required. * * * In addition, the Commission, in determining the precise territory which may be served by a particular carrier cannot be unmindful of its responsibility to coordinate the various transportation agencies which constitute our national transportation system * * *.

"* * * [T]he purpose of the 'grandfather clause' was to assure those to whom Congress had extended its benefits a 'substantial parity between future operations and prior *bona fide* operations'." (315 U.S. 475, 480–481, 62 S.Ct. 722, 726).

With a terse per curiam opinion (three justices dissenting), the Supreme Court in Willis Shaw Frozen Express, Inc. v. United States, 377 U.S. 159, 84 S.Ct. 1154, 12 L.Ed.2d 211 (1964), made it clear that the Interstate Commerce Commission must apply these standards under the "grandfather clause" of the Transportation Act of 1958:

"We think United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971, requires reversal of the judgment and a remand to the Commission for reconsideration in light of appellant's status and performance as a common carrier, the transportation characteristics and marketing pattern of these seasonal agricultural products, and the demonstrated ability of appellant to perform the services." (377 U.S. 159, 159–160, 84 S.Ct. 1154, 1155).

In its final report in the case under consideration here, the Commission indicated its awareness of these principles when it cited the *Carolina Freight* case and stated that "the characteristics of the transportation service rendered are relevant to the territorial scope of the operations to be authorized." (98 M.C.C. 702, 706). Our subsequent specific review of the Commission's conclusions will also consider Newton's evidence of the factors listed in the *Willis Shaw* case.

While the relevant legal principles are thus quite apparent, there is considerable difficulty in applying them to peculiar facts and circumstances in each case. Several recent cases have arisen in which the courts have found error in the Commission's treatment of the "grandfather" question. These cases provide a convenient starting place for analysis of the Commission's action in the present case.

Many of the cases have involved the issue of what period of operations is relevant to the statutory date of May 1, 1958. For example, in Frozen Food Express v. United States, 219 F.Supp. 131 (D.C.Texas 1963), the Commission had refused to consider shipments transported prior to January 1, 1957 as being too remote. The Court held that there was error in the selection of this cut-off date, stating:

"The plaintiff should have been given an opportunity to show the nature and extent of its operations for a sufficient period prior to 1957 to prevent any distortion of the true pattern of its activities due to a variance in seasons and in the other factors that affect crops of the kind here involved." (219 F.Supp. 131, 139).

See also Winter Garden Co. v. United States, 211 F.Supp. 280 (D.C.Tenn. 1962); Hale Distributing Co. v. United States, 221 F.Supp. 266 (D.C.Calif. 1963). In the case presently under consideration, although Division 1 stated that certain shipments transported by Newton in 1956 were "too remote from the statutory date of May 1, 1958, to establish bona fide operations thereon, and will not be considered by us" (84

M.C.C. 759, 774), the full Commission on reconsideration included these 1956 shipments in its analysis (98 M.C.C. 702, 704, 707–708). Our review likewise will include consideration of Newton's evidence of shipments in 1956.

Another issue raised in the cases is whether frozen fruits, berries, and vegetables should be considered as a single commodity class for purposes of analyzing bona fide operations under the "grandfather" clause. For instance, in Winter Garden Co. v. United States, 211 F.Supp. 280 (D.C.Tenn.1963), the Court held that in certain instances the Commission committed error by restricting authority to frozen berries to the exclusion of frozen vegetables. See also Frozen Food Express v. United States, 219 F.Supp. 131 (D.C.Texas 1963); Willis Shaw Frozen Express, Inc. v. United States, 256 F.Supp. 257 (D.C.Ark.1966). In the case presently under consideration, although Division 1 in its findings treated the three commodities in separate classes (84 M.C.C. 759, 771), the full Commission on reconsideration stated that it was "inclined to believe that the evidence considered as a whole supports the view that the three involved commodities have been handled by applicant as a single class, and they will be so regarded herein". (98 M.C.C. 702, 707). Accordingly, in our review we also will treat the commodities as being in a single class.

We turn now to a specific consideration of the "grandfather" authority which the Commission granted on the basis of the evidence submitted by Newton. In particular, we must review the evidence upon which the Commission determined the extent of Newton's actual bona fide operation as contrasted with mere holding out. In undertaking this task we are not unmindful that "the precise delineation of the area or the specification of localities which may be serviced has been entrusted by the Congress to the Commission", United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 480, 62 S.Ct. 722, 86 L.Ed. 971 (1942), and that "the judgment required is highly expert. Only where the error is patent may we say that the Commission transgressed". Ibid., at 482, 62 S.Ct. at 726. In fact, the United States Supreme Court in a case involving review of a Commission action in another area has very recently reversed a judgment of a three-judge District Court on the ground that:

> "As we said in Consolo v. Federal Maritime Comm'n., 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence'. It is not for the court to strike down conclusions that are reasonably drawn from the evidence and findings in the case. Its duty is to determine whether the evidence supporting the Commission's findings is substantial, Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474 (1951) 71 S.Ct. 456, 95 L.Ed. 456." Illinois Central R. Co. v. Norfolk & Western Ry. Co., 385 U.S. 57, 87 S.Ct. 255, 17 L.Ed.2d 162 (November 14, 1966).

It appears from the evidence before the Commission that Newton is an irregular-route motor common carrier operating 16 tractors and trailers, 15 of which are refrigerated, from a base terminal in Bridgeville, Delaware. Two shippers appeared before the Commission in support of Newton's application. One, John H. Dulany & Son, Inc., ships the frozen foods involved from its own processing plants at Bridgeville, Delaware and Exmore, Virginia and from co-processors elsewhere to warehouses and distributors in the territory under consideration. The other, Libby, McNeill & Libby, ships frozen foods from its processing plant at Houston, Delaware and warehouses elsewhere to customers and other warehouses.

Newton submitted into evidence a record of some 225 separate trips it made during the years 1956, 1957, 1958, and 1959. This record included all of the shipments of the involved commodities

handled by Newton from January 14, 1957 through November 19, 1959, except those originating from Exmore, Virginia and Bridgeville, Dover and Houston, Delaware; seven shipments in 1956 also claimed by another trucker; and shipments hauled by Newton from Exmore, Bridgeville, Dover, and Houston during the month of August of the years 1957, 1958, and 1959.[6] While we recognize that Newton during these years may have engaged in transportation which is not of record, we are limited to these 225 or so trips to the extent Newton's actual performance is relevant in our review of the Commission's action. Newton itself has made the decision to base its "grandfather" application on these 225 or so trips and we cannot speculate on the impression which might have been created by a record which contained a different sampling, or indeed all, of the trips Newton undertook during this or any other period of time. Of course, as we have seen the law requires, we also look beyond the actual trips to other factors which might indicate that the particular hauls are representative of a broader service.

It will be useful to break our analysis down into three stages corresponding to the three areas of operation Newton desires to have authorized.[7] At each stage we shall compare the authority Newton sought with the authority the Commission granted and analyze the evidence of shipments not only actually made but also authorized to be made under Newton's "general commodities" and "frozen foods" clauses.[8] For we agree with the Commission below that:

> "To exclude from consideration shipments which might have been transported under authority then held by applicant would create a fragmented and distorted view of the totality of applicant's operation and constitute a serious impediment to the achievement of substantial parity between applicant's past and future service. Indeed, such a conclusion would, in effect, penalize applicant for holding certificates authorizing broad 'general commodity' and 'frozen food' authority." (98 M.C.C. 702, 706).

Newton first requested authority to transport the frozen foods involved throughout the Middle Atlantic area of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and the District of Columbia. The Commission granted Newton an area-wide authority between all points within a central core comprised of Maryland, Delaware, that part of Virginia on the Delmarva Peninsula, and Washington, D. C. The Commission made this grant on the basis of Newton's evidence of some 85 shipments between points within this area, and on the basis of the "general commodities" and "frozen foods" authority set out in the margin.[9]

6. These shipments are summarized in Appendix B to the original report, 84 M.C.C. 759, 773–776.

7. These are as follows:
(1) Between all points in New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and the District of Columbia.
(2) Between the points described in (1) above, on the one hand, and on the other, all points in Maine, New Hampshire, Vermont, Massachusetts Rhode Island, Connecticut, North Carolina, South Carolina, Georgia, and Florida.
(3) Between all points in Maine, Massachusetts, and Connecticut, on the one hand, and, on the other, all points in North Carolina, South Carolina, Georgia, and Florida.

8. These authorities are summarized in the Appendix to 98 M.C.C. 702, 711, except for the following authority which the Commission apparently overlooked: General commodities, from Baltimore, Md., and Long Island City, N. Y., and from points in New Jersey, to points in Sussex and Kent Counties, Del., and those in Caroline, Dorchester, Queen Annes, Somerset, Talbot, Wicomico, and Worcester Counties, Md.

9. General commodities, with exceptions, between Princess Anne, Md., and points within 15 miles thereof, not including Salisbury, Md., on the one hand, and, on the other, Wilmington, Del. and Baltimore, Md. General commodities, with exceptions, from Baltimore, Md. to points in Sussex and Kent Counties, Del., and those in

The Commission also granted Newton authority from all points in New York to all points within the central core area. The Commission made this grant on the basis of Newton's evidence of 8 shipments from points in New York to points within the central core, and on the basis of the "general commodities" and "frozen foods" authority set out in the margin.[10] In addition, the Commission granted Newton authority in the opposite direction from all points within the central core area to all points in New York. The Commission made this grant on the basis of Newton's evidence of 39 shipments from points within the central core to points in New York, and on the basis of the "general commodities" and "frozen foods" authority set out in the margin.[11]

The Commission also granted Newton authority from all points within the central core area to all points in Pennsylvania. This grant was made on the basis of Newton's evidence of 21 shipments from points within the central core to points in Pennsylvania, and on the basis of the "general commodities" and "frozen foods" authority set out in the margin.[12] In addition, the Commission granted Newton authority in the opposite direction from all points in Pennsylvania to Exmore, Va. This grant was made on the basis of Newton's evidence of 15 shipments from points in Pennsylvania to Exmore, Va.

Finally, the Commission granted Newton authority from all points within the central core area to Kearney and Jersey City, N. J. The Commission made this grant on the basis of 5 shipments from points within the central core to Kearney and Jersey City, N. J., and on the basis of the "general commodities" and "frozen foods" authority set out in the margin.[13]

It appears from the foregoing analysis that, while the Commission granted rather extensive authority within the Middle Atlantic area, it failed to grant the full authority Newton desires. There was some evidence which might have been a basis for further grants of authority. A statewide authority to New Jersey from the central core might have been based on Newton's evidence of a single shipment from Exmore, Va. to Spring Lake, N. J., and on the "general commodities" and "frozen foods" authority set out in the margin.[14] However,

Caroline, Dorchester, Queen Annes, Somerset, Talbot, Wicomico, and Worcester Counties, Md. Frozen foods, from Exmore, Va., and Bridgeville and Dover, Del., to points in Delaware, Maryland and the District of Columbia. Frozen foods between Exmore, Va., Bridgeville and Dover, Del. Frozen foods from Houston, Del., to Dover, Delaware.

10. General commodities, with exceptions, between Princess Anne, Md., and points within 15 miles thereof, not including Salisbury, Md., on the one hand, and, on the other, New York, N. Y.
General commodities, with exceptions, from Long Island City, N. Y., to points in Sussex and Kent Counties, Del., and those in Caroline, Dorchester, Queen Annes, Somerset, Talbot, Wicomico, and Worcester Counties, Md.
Frozen foods, from Brockport, N. Y., to Exmore, Va., and Bridgeville, Del.

11. General commodities, with exceptions, between Princess Anne, Md., and points within 15 miles thereof, not including Salisbury, Md., on the one hand, and, on the other, New York, New York.
Frozen foods from Exmore, Va., and Bridgeville and Dover, Del. to points in New York.

12. General commodities, with exceptions, between Princess Anne, Md., and points within 15 miles thereof, not including Salisbury, Md., on the one hand, and, on the other, Chester, Marcus Hook, and Phila., Pa. Frozen foods, from Exmore, Va., and Bridgeville and Dover, Del., to points in Pennsylvania.

13. General commodities, with exceptions, between Princess Anne, Md., and points within 15 miles thereof, not including Salisbury, Md., on the one hand, and, on the other, Jersey City, N. J.
Frozen foods, from Exmore, Va., and Bridgeville and Dover, Del., to points in New Jersey.

14. General commodities, with exceptions, between Princess Anne, Md., and points within 15 miles thereof, not including Sal-

we believe that the Commission's decision was adequately supported by its judgment that "a single shipment to Spring Lake, N. J., in 1959 appears to have been an isolated one which does not, in our opinion, warrant additional rights". (98 M.C.C. 702, 708). Nor can Newton be greatly hurt by this conclusion because it possesses "frozen foods" authority from Exmore, Va., and Bridgeville and Dover, Delaware to all points in New Jersey and "grandfather" authority between all points in the central core, authorities which together allow it to go from all points in the central core to all points in New Jersey by following sometimes circuitous routes through Exmore, Va., or Bridgeville or Dover, Del.[15] Again, there was some evidence which might have been a basis for a further grant of authority from all points in New Jersey back to the central core area, namely, the "general commodities" and "frozen foods" authority set out in the margin.[16] However, as Newton submitted no evidence of transportation from New Jersey to the central core we cannot say that the Commission's judgment not to grant such authority was unwarranted.

Newton also submitted evidence of one trip from Seabrook, N. J. to Norfolk and Roanoke, Virginia which might have been the basis for additional grandfather rights. But we cannot substitute our judgment for the Commission's conclusion that "a split load from Seabrook, N. J., to Norfolk and Roanoke, Va., in 1957 * * * [is] not demonstrative of continuous operations justifying a 'grandfather' grant". 98 M.C.C. 702, 707). Newton also submitted evidence of a shipment from Salisbury, Md. to Norfolk, Va. which, together with the "frozen foods" authority set out in the margin[17], might have been the basis of a grant of "grandfather" authority from the central core area to Virginia. But again our limited powers of judicial review do not allow us to upset the Commission's judgment.

There was certain "general commodities" authority which might have been the basis of a grant from Pennsylvania to the base area.[18] But as these Pennsylvania points are all concentrated along the Delaware River near Delaware the Commission was justified in not basing a grant of statewide authority from Pennsylvania upon them.

Finally, Newton's evidence of a single shipment from Richmond to Exmore, Va. in 1959 is not sufficient for any additional grant of "grandfather" authority.

This detailed examination of the evidence of shipments within the Middle Atlantic area reveals that the Commission was rather generous in its grants of "grandfather" authority to Newton. The Commission adopted an origin territory approach rather than an origin points approach. Compare Jarman v. United States, 219 F.Supp. 108 (D.C. Md.1963). The Commission did not fail

isbury, Md., on the one hand, and, on the other, Newark, N. J.
Frozen foods, from Exmore, Va., and Bridgeville and Dover, Del. to points in New Jersey.

15. See 98 M.C.C. 702, 709: "Pursuant to certificates now in force and the 'grandfather' rights authorized herein, applicant may now perform a large part of the service proposed in the subtitled proceeding, either directly or by tacking of the rights held."

16. General commodities, with exceptions, between Princess Anne, Md., and points within 15 miles thereof, not including Salisbury, Md., on the one hand, and, on the other, Newark and Jersey City, N. J.
General commodities, with exceptions, from points in New Jersey to points in Sussex and Kent Counties, Del., and those in Caroline, Dorchester, Queen Annes, Somerset, Talbot, Wicomico, and Worcester Counties, Md.
Frozen foods between Exmore, Va., Vineland, N. J., Bridgeville and Dover, Del.

17. Frozen foods, from Exmore, Va. and Bridgeville and Dover, Del. to points in Virginia.

18. General commodities, with exceptions, between Princess Anne, Md., and points within 15 miles thereof, not including Salisbury, Md., on the one hand, and, on the other, Chester, Marcus Hook, and Philadelphia, Pa.

to consider the other relevant factors detailed in the *Willis Shaw* decision.[19] With few exceptions, the Commission did in fact base grants of "grandfather" authority upon all the actual shipments Newton introduced into evidence. Even when considered together with Newton's alleged holding out,[20] these exceptions which involved only a few isolated shipments are not sufficient to justify interference with the Commission's denial of further grants of "grandfather" authority here.

Newton secondly requested authority to transport the frozen foods involved between the Middle Atlantic area and the New England states of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, and Connecticut, and between the Middle Atlantic states and the Southeastern area of North Carolina, South Carolina, Georgia, and Florida. The Commission granted Newton authority from the central core area of the Delmarva Peninsula, Maryland, and the District of Columbia to Hartford and Wallingford, Connecticut, and Lewiston, Maine. The Commission made this grant on the basis of Newton's evidence of some ten shipments from the central core to these New England points, and on the basis of the "frozen foods" authority set out in the margin.[21] The Commission also granted Newton authority from Caribou, Maine, to New York, N. Y., and Carnegie, Pennsylvania. The Commission made this grant on the basis also of some ten shipments from Caribou to New York and Carnegie.

It appears that with respect to transportation between the Middle Atlantic states and New England and the south the Commission greatly restricted its grant of "grandfather" authority compared to Newton's request. Therefore, it is important to analyze Newton's evidence which was deemed insufficient as a basis for the grant of further "grandfather" authority. First, there was evidence of seven shipments in the latter part of 1958 and in 1959 from Caribou, Maine to Exmore, Virginia. As none of these shipments was made before the statutory date, they did not necessarily require the Commission to grant additional "grandfather" authority. Besides, since Newton will be authorized to make such shipments in the future by combining the "grandfather" authorities from Caribou to New York and from all points in New York to the central core area,[22] the carrier cannot be greatly disturbed by this conclusion. A single shipment from Caribou, Maine to Philadelphia, Pennsylvania in 1959 could rightfully have been rejected by the Commission as a basis for additional "grandfather" authority. We thus find no acceptable basis for overruling the Commission's conclusion that "no authority is warranted from Maine origins in addition to that granted * * *". (98 M.C.C. 702, 707).

Newton also submitted evidence of three shipments from Watertown, Mass. and Hartford, Conn. to Philadelphia, Pa. and Houston, Delaware. Again, we must respect the Commission's judgment in denying further "grandfather" authority on the basis of this evidence: "The only shipments shown to have been moved by applicant from Con-

19. The Commission stated: "In determining the characteristics of the service which applicant has performed in the transportation of the 'grandfather' commodities here involved, it is significant, we believe, that applicant's operations have been performed principally for the two shippers which appeared in support of the application in the subtitled proceeding. A large portion of the traffic has moved between production and processing points and from such points to storage facilities at various points throughout the considered territories." (98 M.C.C. 702, 706)

20. It is to be observed that Newton was not denied the opportunity of submitting evidence of solicitation. Compare Frozen Food Express v. United States, 219 F. Supp. 131 (D.C.Texas 1963).

21. Frozen foods, from Exmore, Va., and Bridgeville and Dover, Del. to points in Connecticut.
Frozen foods, from Dover, Del., to points in Maine.

22. See Footnote 15.

necticut and Massachusetts were one to Houston, Del., and two to Philadelphia, Pa., from Hartford, Conn., and Watertown, Mass., (split pickups), both after the critical date. These movements are insufficient to show operations on the critical date from this territory". (98 M.C.C. 702, 707).

Outbound from the Middle Atlantic states to New England, Newton produced evidence of one shipment from Landover, Md. and one from Pittsburgh, Pa. to Watertown, Mass., one shipment from Houston, Del. to Springfield, Mass., one from Exmore, Va. to Warren, R. I., and two split loads from Seabrook, N. J. to Bangor and Pinepoint, Maine. Newton also has the "frozen foods" authority outbound to New England which is set forth in the margin.[23] The Commission concluded that "two split loads to Bangor and Pinepoint, Maine, in 1956 are not demonstrative of continuous operations justifying a 'grandfather' grant" (98 M.C.C. 702, 707) and that "shipments to Watertown and Springfield, Mass., after the critical date, and to Warren, R. I., before the critical date, are insufficient to meet the statutory requirement of continuous service on and since the critical date". (98 M.C.C. 702, 708). The fragmentary character of these shipments justifies the Commission's conclusions. In addition, since Newton may combine its "grandfather" authority within the central core and its "frozen foods" authority to New England points from Dover, Delaware,[24] we do not think that the Commission's denial of further "grandfather" authority here should be upset by us.

The only evidence Newton introduced to support its application between the Southeastern states and the Middle Atlantic states consisted of split loads from Tampa, Florida to New York and Jersey City and from Plant City, Fla., to Charlotte, N. C., and Philadelphia and Altoona, Pennsylvania before the critical date, plus the "frozen foods" authority set out in the margin[25]. Considering the totality of the record, we cannot disagree that such evidence is "not indicative of continuous operations from that territory for which 'grandfather' rights should be granted." (98 M.C.C. 702, 707).

Therefore, as to the second part of Newton's application concerning transportation between the Middle Atlantic states, on the one hand, and New England and the Southeast, on the other, we find sufficient basis not to overturn the Commission's action as being unduly limited. We recognize that Newton may have solicited business between these areas and that Newton, if it does not have authority to haul other products inbound, may be left primarily with an uneconomic one-way outbound service to New England. The decision which the Commission has made in the matter is, however, well within the bounds of its discretion. See Colonial Refrigerated Transportation, Inc. v. United States, 255 F. Supp. 999, 1003 (D.C.Ala.1966):

> "We cannot say that, in weighing the specific evidence contained therein against the backdrop of the complexities of this transportation service, a process requiring the exercise of expert, empirical judgment, the Commission transgressed in imposing such geographical restrictions."

Finally, Newton requests authority to transport the frozen foods involved between the New England states of Maine, Massachusetts, and Connecticut and the Southeastern states of North Carolina, South Carolina, Georgia, and

23. Frozen foods, from Exmore, Va., and Bridgeville and Dover, Del. to Boston and Cambridge, Mass. and points in Connecticut.
Frozen foods, from Dover, Delaware to points in Rhode Island, Vermont, New Hampshire, Maine, and those in Massachusetts except Boston and Cambridge.

24. See Footnote 15.

25. Frozen foods, from Exmore, Va., and Bridgeville and Dover, Del. to points in North Carolina.

Florida. As Newton submitted no evidence whatsoever of shipments between these states, nor sufficient evidence of other pertinent factors, the Commission correctly denied any grant of "grandfather" authority for such transportation.

Our ultimate conclusion, then, is that the Commission's grant of "grandfather" authority to Newton may not be disturbed. We now consider whether additional rights should have been conferred in the extension proceedings.

Newton asserts in its third argument that the Commission erred in denying in its entirety the "extension" application under 49 U.S.C.A. § 307(a). For a motor carrier to be granted relief under this section, it must bear the burden of demonstrating that the present or future public convenience and necessity will be served by the services sought. Newton has failed to meet this burden.

A basic ingredient in the determination of public convenience and necessity is whether the existing facilities are adequate to meet the present or future transportation requirements. Curtis, Inc. v. United States, 225 F.Supp. 894 (D.C.Colo.1964), aff'd mem., 378 U.S. 128, 84 S.Ct. 1658, 12 L.Ed.2d 744 (1964). On this vital issue the Commission found (98 M.C.C. 702, 709):

> "[A]pplicant has failed to demonstrate with any reasonable degree of specificity that the service afforded by existing carriers is inadequate. Indeed, existing regular—and irregular—route common carriers provide direct service for the transportation of frozen foods at virtually all points in the Middle Atlantic States and offer interline arrangements for movements between southern and New England states, and shippers admit their satisfaction with these services to the extent authorized."

The record amply supports the accuracy of the Commission's finding that there exists direct service and interline arrangements throughout the areas involved. Nonetheless, Newton attacks the Commission's finding as to the adequacy of that service. It asserts that the service of "existing carriers" which the Commission found to be adequate included Newton's own service and for this reason the finding is unsupported under Nashua Motor Express, Inc. v. United States, 230 F.Supp. 646, 653 (D.C.N.H. 1964). However, evidence before the Commission, which included the protestants' operating authorities[26] and testimony as to the satisfactory nature of the services of motor carriers other than Newton, fully justified its conclusion that the existing service was adequate and satisfactory.

Nevertheless, Newton points out that when the shippers expressed their satisfaction with the existing service, exclusive of Newton's, they were careful to limit their approval to the services performed within the scope of the carriers' authorities. Transportation beyond the reach of the authority of a given motor carrier necessitated resort to joint-line transportation, i. e., the use of two or more inter-connecting carriers. Since the shippers with virtual unanimity expressed a preference for straight line rather than joint-line service for the transportation of frozen foods, Newton contends that the service offered by the other carriers was not satisfactory to the shippers, and that the finding of the Commission to the contrary is not supported by the evidence. The answer to this argument is found in the Commission's report (98 M.C.C. 702, 709):

> "A mere preference for single-line service, of course, is not sufficient to show inadequacy of joint-line service, in the absence of demonstrated service deficiencies."

This conclusion is based upon judicial precedent from which there appears to be no dissent. Ayer v. United States, 139 F.Supp. 440, 443–444 (D.C.Ga.1956); Colorado-Arizona-California Express, Inc. v. United States, 224 F.Supp. 894,

26. See Appendix C, 89 M.C.C. 269, 276–277.

898 (D.C.Colo.1963); Curtis, Inc. v. United States, supra, 225 F.Supp. at 900.

■ Although the Commission recognized that evidence of past services is a factor to be considered in determining whether a public need exists for the authority sought, Newton asserts that the Commission erroneously failed to consider its past services and the findings of the First Commission Report in that regard. This criticism is unfounded. The Third Report, in considering Newton's "grandfather" application, carefully analyzed the prior services which Newton performed. Upon the basis of that analysis the Commission partially granted Newton's "grandfather" application, not only with respect to certain point to point operations, but extensively as to a number of state-wide operating rights. In this latter respect, the Third Report contrasts sharply with the First Report which denied Newton any state-wide rights under the "grandfather" application. The Commission, in discussing the "extension" application, said in its Third Report (98 M.C.C. 702, 710):

> "There are very few points or territories at which *any* service has been shown to have been provided by applicant which are not covered by our grant of authority in [the grandfather] proceeding." [27]

The Commission concluded that this evidence of past operations by Newton did not warrant granting to Newton any "extension" rights. In view of the difference between the First and Third Report in the evaluation of the evidence as it related to Newton's "grandfather" rights, it would have been pointless for the Third Report to have referred to the findings in the First Report as to Newton's past services.

■ Finally, Newton contends that as in *Nashua* the Commission incorrectly limited its consideration of public convenience and necessity to a determination of the adequacy of existing service. It is clear, however, that the Commission did not so limit itself, but concluded only that "any claim of public need for the proposed service based on an asserted lack of satisfactory service must fail." (98 M.C.C. 702, 709). Congress intended to leave to the Commission administrative discretion to decide whether additional motor service would serve public convenience and necessity. Interstate Commerce Commission v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945). Our conclusion, then, is that the Commission's denial of Newton's request for "extension" authority was a sound exercise of its administrative discretion.

As we find no cause for remand of these proceedings to the Commission, upon submission an appropriate order will be entered dissolving the temporary stay of the Commission's order and dismissing the action.

STEEL, District Judge (concurring).

I, like the majority, find it unnecessary to resolve the issue whether Newton's "agricultural commodities" and "farm produce" certificates should be interpreted as the Commission asserts was intended at the time of their issuance or should be accorded the meaning attributed to "agricultural commodities" in section 203(b) (6) of the Interstate Commerce Act by the Supreme Court in Home Transfer & Storage Co. v. United States, 141 F.Supp. 599 (D.C.Wash. 1956), aff'd. per cur., 352 U.S. 884, 77 S.Ct. 129, 1 L.Ed.2d 82 (1956). I, therefore, refrain from expressing any view on this question, even by way of *dictum*, as has the majority of the Court. Otherwise, I concur in its opinion.

---

27. The accuracy of this finding is justified by the record. There were only about fifteen shipments by Newton which were not the basis of "grandfather" grants. Almost without exception, there was only one shipment between any two points.